# Illinois Official Reports

## Appellate Court

***People v. Phillips*, 2017 IL App (4th) 160557**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. COREY D. PHILLIPS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-16-0557 |
| Filed | December 5, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Adams County, No. 09-CF-495; the Hon. Mark A. Drummond, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Kerry J. Bryson, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and Amelia S. Buragas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Steigmann and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Corey D. Phillips, appeals from the denial of his amended postconviction petition after a third-stage evidentiary hearing. Defendant argues he made a substantial showing his (1) trial counsel provided ineffective assistance by failing to perfect the impeachment of the victim regarding an agreement to testify, (2) due process rights were violated by the State's failure to correct victim's perjured testimony regarding the agreement to testify, and (3) appellate counsel provided ineffective assistance by failing to raise the violation of his statutory right to a speedy trial on appeal from his conviction and sentence. We disagree and affirm.

¶ 2                    I. BACKGROUND

¶ 3    On August 12, 2009, the State charged defendant by information with aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2008)), a Class X felony. On August 13, 2009, defendant was served with an arrest warrant and taken into custody. Defendant remained in custody throughout the pretrial proceedings.

¶ 4    On August 14, 2009, defendant made his first appearance before the trial court and requested counsel be appointed. Based on defendant's affidavit of assets and liabilities, the court found defendant to be indigent. The court appointed Assistant Public Defender Todd Nelson to represent defendant and advised defendant of his possible obligation to repay the county for the public defender expenses. Following an August 20, 2009, status hearing, the court scheduled a preliminary hearing and arraignment for September 1, 2009.

¶ 5    On September 1, 2009, the trial court commenced the scheduled preliminary hearing and arraignment. Defendant appeared with Nelson. Nelson informed the court: "I'm going to have to withdraw [due to a conflict of interest], and I think Mr. Downey is going to be taking [the] case." Ed Downey, who was the chief public defender, was present. Downey indicated: "I'm going to review [the case], because I just haven't even looked at the file to make sure there are no conflicts *** [s]o we'd ask it be continued." The court stated it would continue the matter to September 8, 2009, "and determine who is going to be representing [defendant]." The State requested Downey to provide notice if he was unable to proceed on September 8, 2009, due to a conflict of interest. The court then directed Downey to inform it if nobody from the public defender's office could take the case so it could appoint outside counsel. The court questioned defendant whether he understood, to which defendant indicated he did and then requested he be surrendered on another charge. The State questioned Downey whether he was in agreement with the surrender, to which Downey indicated he was. The court's written order states: (1) defendant appears with Nelson and Downey, (2) Nelson indicates he has a conflict, (3) Downey "will review these matters," (4) defendant surrenders himself in an unrelated case, and (5) the cause is continued to September 8, 2009, "[o]n motion of [d]efendant."

¶ 6    On September 4, 2009, Downey filed an "Entry of Appearance," which indicated he was moving to assign Assistant Public Defender Holly Henze as attorney for defendant.

¶ 7    On September 8, 2009, the trial court conducted further proceedings on the continued preliminary hearing and arraignment. Defendant appeared before the court. The court initially noted the matter had been assigned to Henze but she could not be present. Downey,

who was present, confirmed Henze was unavailable and indicated he spoke with defendant, who stated he wanted to proceed with a preliminary hearing. Downey informed the court he was ready to proceed. During the preliminary hearing, Downey cross-examined the State's witness. The court also allowed Downey the opportunity to present argument on behalf of defendant. The court found probable cause to believe defendant committed the charged offense. The State inquired as to whether the court preferred to continue the arraignment to allow Henze to speak with defendant. Downey indicated he believed such a continuance "would be appropriate." The court continued the matter to September 15, 2009, for arraignment. The court's written order indicates defendant appeared with Downey for Henze.

¶ 8 At the scheduled September 15, 2009, arraignment, defendant appeared with Henze. Downey was also present. Henze informed the court she had a conflict of interest, and Downey recommended the outside counsel be assigned to represent defendant, as all the attorneys in the public defender's office had conflicts. The court appointed outside counsel, Todd Eyler, to represent defendant and continued the matter on its own motion.

¶ 9 On September 22, 2009, defendant was arraigned, and a jury trial was scheduled. Defendant's jury trial was later rescheduled for December 14, 2009.

¶ 10 At a December 9, 2009, status hearing, Eyler indicated he would be unavailable from December 14, 2009, through December 16, 2009, and requested the trial setting be continued until December 17, 2009, which the trial court allowed.

¶ 11 On December 17 and 18, 2009, the trial court conducted a jury trial. After the jury was selected and sworn, defendant made an oral motion to dismiss based on a violation of his speedy-trial rights. The court denied defendant's motion.

¶ 12 Kenneth Norwood testified that, on the afternoon of August 12, 2009, he was awakened in his apartment around 2 p.m. by his girlfriend, Archieona French, who told him defendant was downstairs making threatening comments about him. According to Norwood, he went outside, with French following behind him, and confronted defendant, who owed him $90. "[A] lot of people" were outside. Norwood struck defendant's head. Defendant pulled out his gun and tried to strike Norwood with it but dropped the gun. Defendant picked up the gun and then fired four shots at Norwood, who was about one foot away from defendant. Two shots struck Norwood in the leg. The bullets passed through and caused minor injuries to Norwood. During cross-examination, Norwood admitted he struck defendant before either of them spoke a word. Norwood also admitted not seeing defendant drop the gun or pick it up, but he testified others told him defendant dropped the gun.

¶ 13 During direct examination, Norwood admitted he had a 2005 felony conviction for "aggravated carjacking." During cross-examination, defense counsel inquired further into Norwood's felony conviction:

"Q. That's where you took the class to obtain the GED [general equivalency diploma]?

A. When I was in prison, yes.

Q. And in light of what you just said, that was for the aggravated carjacking, is that correct?

A. Yes.

Q. And that was out of Cook County?

A. Yes.

Q. And is that the only felony conviction that you have?

A. I probably have a drug conviction, but that's it.

Q. Well, you said you probably have one. Do you know?

A. I'm not sure. I was fighting in prison, and I never knew what happened with that.

Q. So you don't know is what you are telling the jury. And what you are telling us, you don't know if you have a second felony conviction?

A. I don't know."

¶ 14 During cross-examination, defense counsel also questioned Norwood regarding a possible deal he may have received for his testimony:

"Q. Did you meet with anybody or discuss your testimony here today?

A. No.

Q. You didn't meet with the State's Attorney's office?

A. Yes. Yes.

Q. Did you meet with any law enforcement to discuss your testimony?

A. No.

Q. Have you been promised anything for your testimony here today?

A. No, sir.

Q. You've not met with police and they've not made a deal with you in terms of your testimony?

A. I haven't been promised anything.

Q. You've been told, though, haven't you, that if you testify here today that certain charges would not be filed against you, is that correct?

A. I haven't been promised anything, sir.

Q. You've not been told that?

A. No.

Q. Have you had a discussion with law enforcement where they've discussed your testimony—

A. No.

Q. Let me finish, please. Where they've discussed your testimony and offered their assistance in seeing what they could do if you testified?

A. No."

¶ 15 On redirect examination, the prosecutor, Anita Rodriguez, stated, "just to clarify so everybody understands *** is it your understanding that you're not going to be referred to investigation for federal charges if you cooperate and testify truthfully in this case ***?" Norwood responded, "That's my first time hearing about that, Mrs. Rodriguez." On recross-examination, Norwood reiterated the same. He also testified, "I know they told me they ain't going to promise me nothing. They ain't said nothing about no federal charges or nothing." Defense counsel asked further, "So you can't come back later if something happens or if somebody or something files charges, you can't come back and raise that as a defense or say, [']hey, I was promised this or I was promised that?['] " Norwood stated he understood.

¶ 16 French testified that, on August 12, 2009, she was visiting Norwood at 531 Lind Street in Quincy. She saw defendant standing outside the residence by the porch. French asked defendant where Norwood's money was. Defendant denied owing Norwood money and said he was going to shoot Norwood and "beat his ass." French ran upstairs to tell Norwood about her interaction with defendant. Norwood ran downstairs. French did not immediately follow Norwood. She heard gunshots as she descended the stairs. By the time French exited the residence, Norwood had been shot, and defendant "was walking up the alley." French also saw "a lot of people out there after [she] heard the gunshots." French did not see defendant with a gun. French acknowledged she had a felony conviction for "[t]hreatening a public official."

¶ 17 Julie Ann Howell, who resided at 527 Lind Street in Quincy, agreed she saw "a large number of persons" outside the residence at 531 Lind Street before 1 p.m. on August 12, 2009. Around 1 p.m., Julie heard three gunshots. She looked through her window and saw someone leaving her neighbor's house. The man was wearing a gray shirt and white shorts. As he walked down Julie's driveway, she saw him put a gun in his pocket. Julie described the man as "[b]igger, stockier," and African American. The man, after walking in her driveway, walked "[u]p the alley across the street."

¶ 18 Andrew Howell, Julie's husband, testified he heard sounds Julie believed were gunshots. Andrew believed they were fireworks. Julie got up and looked through the window. She reported seeing someone in the driveway. A couple of seconds later, Andrew stood and went to the window. He saw "a black male," but he could not describe what the male was wearing. Andrew acknowledged he had two felony convictions for burglary and residential burglary.

¶ 19 Delaun Tornell Elliott testified that, on August 12, 2009, he had been staying at 531 Lind Street for approximately six months. Just before Norwood was injured, Elliott was upstairs watching television. Elliott heard Norwood arguing with someone as Norwood went down the stairs that led to the front door. Elliott followed Norwood. Norwood exited the front door and "off of the front step off of the sidewalk in front of our step." Elliott went to the kitchen to get a drink. As Elliott turned toward the kitchen, he saw "a couple people on the porch" and "somebody else on the sidewalk." Elliott could not see the person standing in front of Norwood. Elliott heard the gunshots and went into the living room, where he stayed until he "knew everything was cool." When asked if he could see "where the shooter went," Elliott stated he went down the block and down the alley. Elliott described the individual as "a tall, black male." Elliott denied telling Detective Cathy Martin the man was named "Corey Phillips." According to Elliott, "people outside in front of the house said they thought his name was Corey Phillips." Elliott testified he saw the gun, which appeared to be black, but he did not see the shooter. On cross-examination, Elliott testified, when Norwood opened the door to stand on the porch, French was already outside. Elliott acknowledged he had a felony conviction for "[f]ailure to register as a sex offender."

¶ 20 Cathy Martin, a detective with the Quincy police department, testified Norwood identified defendant as the shooter at the hospital on August 12, 2009. Bruce Scott, a resident of 531 Lind Street, also identified defendant as the shooter. Detective Martin testified she interviewed defendant on August 13, 2009. Defendant wore white shorts and a white shirt and stated he wore the same clothes the day before. Defendant could not tell Detective Martin where he was on August 12. Defendant denied being on Lind Street that day. Detective Martin testified that during three searches, no bullet, fragment, or shell was found.

¶ 21 On cross-examination, Detective Martin stated she interviewed Scott at the scene of the shooting. Scott informed her the shooter wore a white shirt and black shorts. He also identified the weapon as a silver gun with wooden handles. Elliott told Detective Martin the gun was black. Detective Martin stated defendant's story did not change during her interview of him.

¶ 22 Scott also testified at trial. When Scott was asked if defendant was at his house on August 12, 2009, Scott testified as follows: "See, that's just where I'm kind of confused on. You know, I think—He, you know, because I had been drinking. I'm on a lot of medications, and I get confused [on] a lot of things, so, uhm, I couldn't swear he was there ***." When asked if he knew the details of the shooting on August 12, Scott replied, "I heard it and everything, and it was, you know, explained to me that that's, you know, what had taken place." Scott, when asked who explained it to him, testified, "several different people." Scott did not remember seeing defendant leave the residence. Scott recalled "somebody pointing out a large person going down the street, and I know [defendant] is a large person, and you know, that's what I got." According to Scott, he spoke with Detective Martin. He told her "what I remembered and what I was told."

¶ 23 Detective Martin was recalled to testify further regarding her interview of Scott, which occurred a short time after Norwood was shot. Scott told her defendant and Norwood argued over money. According to Scott, he heard defendant say, "Bitch, I got something for you," and then saw defendant pull out a gun and shoot Norwood. Scott was sitting on the porch when the shooting occurred.

¶ 24 Adam Yates, a Quincy police officer, testified defendant was identified as the shooter at the scene. A 14-year-old boy, who Officer Yates believed provided a false name, identified the shooter as wearing black jogging pants.

¶ 25 Defendant called Doug McQuern, a detective with the Quincy police department, who testified he presented a photo lineup on August 12, 2009, to Elliott. The lineup contained a photograph of defendant. Elliott could not identify him.

¶ 26 William Calkins, an officer with the Quincy police department, testified he interviewed French regarding the shooting. French told Officer Calkins defendant had a silver gun and provided the officer with the make and model of the weapon. French also told the officer defendant was running with the gun. Officer Calkins testified no weapon was found during a search of defendant's mother's apartment.

¶ 27 In closing argument, defense counsel reminded the jury: "It certainly is important to remember and assess all of what people said in determining who you are going to believe and who you are not going to believe." Counsel referred to the State's witnesses as a "flock of felons." Counsel argued Norwood was a convicted felon. Counsel argued Norwood's testimony was inconsistent with the testimony from other witnesses. Counsel noted:

> "You heard Mr. Norwood also say and inconsistently suggest what he did or didn't know about a meeting and/or—well, a meeting with law enforcement and/or what he was or wasn't told or what he was or wasn't promised. Now, he was very clear to me or at least he tried to be very clear that he didn't know what I was talking about, but the State's Attorney's office in rebuttal, if you will, or redirect cleared that up. How did the State's Attorney's office know about that if it didn't happen?"

Counsel argued, in assessing the credibility of the State's witnesses, the jury should consider the inconsistent statements from the State's witnesses and the fact those witnesses were "not the most outstanding citizens."

¶ 28    Following closing arguments, the jury found defendant guilty.

¶ 29    On December 23, 2009, defendant filed a motion to reconsider the denial of his motion to dismiss for a violation of his speedy-trial rights and a memorandum of law in support, which he later supplemented. In part, defendant argued his statutory right to a speedy trial (725 ILCS 5/103-5(a) (West 2008)) was violated because the State failed to prosecute him within 120 days from the date he was taken into custody. Defendant attached to his motion an affidavit from Downey, which averred, in part, as follows:

> "[U]pon receipt of the [o]rder entered on September 1, 2009, I reassigned this case to another public defender, Holly Henze. Due to a scheduling conflict of Holly Henze, I appeared for her on September 8, 2009[,] and a preliminary hearing was conducted. Probable [c]ause was found and the matter was continued for [a]rraignment."

Defendant also attached to his motion an affidavit of Henze, which averred, in part, as follows: "Due to a scheduling conflict, I could not appear on September 8, 2009[,] but Chief Public Defender[ ] Ed Downey appeared for me."

¶ 30    On February 16, 2010, the State filed a response to defendant's motion to reconsider. The State argued, in part, it tried defendant within the requisite statutory period because both the September 1, 2009, and September 8, 2009, continuances were delays attributable to defendant.

¶ 31    On February 23, 2010, defendant filed a reply to the State's response to his motion to reconsider. Defendant argued, in part, the September 1, 2009, and September 8, 2009, continuances were delays not attributable to him as they occurred because of a withdrawal of counsel due to a conflict of interest.

¶ 32    On February 24, 2010, the trial court held a hearing on defendant's motion to reconsider and sentencing. After reviewing the transcripts and considering the arguments presented, the court denied defendant's motion to reconsider. The court specifically found the State tried defendant within the requisite statutory period because the delays caused by both the September 1, 2009, and September 8, 2009, continuances were attributable to defendant. The court then sentenced defendant to 30 years' imprisonment. Defendant appealed.

¶ 33    On appeal from his conviction and sentence, defendant argued the trial court abused its discretion when it sentenced him to the maximum nonextended penalty allowed by statute. *People v. Phillips*, 2011 IL App (4th) 100240-U, ¶ 2. In August 2011, this court affirmed, finding defendant forfeited his argument by failing to raise it in a posttrial motion. *Id.* ¶ 11.

¶ 34    In July 2012, defendant filed a *pro se* postconviction petition. In his petition, defendant alleged, in part, he was (1) denied due process where the prosecutor failed to correct Norwood's false testimony regarding the consideration he received for his testimony, (2) provided ineffective assistance where his appellate counsel failed to raise the violation of his right to a speedy trial, and (3) provided ineffective assistance where his trial counsel failed to impeach Norwood regarding the consideration he received for his testimony. Defendant attached to his postconviction petition an April 14, 2011, letter from his trial counsel, which stated as follows:

"I am writing in response to your letter to me dated April 11, 2011[,] where you ask about my knowledge of the deal that Kenneth Norwood made to testify at your trial. I have pulled your file and from reviewing my notes it appears that I would have learned this information from the State[']s Attorney['s] Office. I say this because that is the type of information that the prosecution must disclose, and on top of that, I do not recall ever having any communication with any of the investigating officers prior to their testimony at trial. Moreover, if you remember when I questioned Mr. Norwood on the stand about this issue he initially denied being offered any plea deal, or having any discussions with either law enforcement of the State[']s Attorney['s] Office what so ever [*sic*]. Obviously, he was lying because I remember making a big deal about the fact that he was lying and that the information that I had was contrary to what he was saying. At that the prosecuting attorney stood up and made the court aware of the fact that Mr. Norwood had been either referred and/or charges deferred pending the outcome of his truthful testimony at trial.

I do not have a copy of the transcript of Mr. Norwood's testimony, but your appellate defender would have a copy of that portion of the transcript and the exact statements made at trial about referral or deferral would be located in that transcript. As I recall, there was no specific deal that was cut, but rather a 'wait and see if you testify truthfully at trial and then we will decide whether or not we will charge you with anything' approach was taken and that is how I remember it coming out at trial."

¶ 35 In October 2012, the trial court entered an order summarily dismissing defendant's *pro se* postconviction petition. In its order, the court found the petition was frivolous and patently without merit, having no arguable basis in law or fact, and was contradicted by the record. Defendant appealed.

¶ 36 On appeal from the summary dismissal of his *pro se* postconviction petition, defendant argued his petition stated the gist of a constitutional claim that he was provided ineffective assistance by trial counsel's failure to perfect the impeachment of Norwood regarding an agreement to testify. *People v. Phillips*, 2014 IL App (4th) 121108-U, ¶¶ 2, 29. In June 2014, this court reversed the trial court's summary dismissal and remanded for further proceedings, finding, based on the trial transcripts and trial counsel's letter, trial counsel arguably provided ineffective assistance by not attempting to perfect the impeachment of Norwood on this matter. *Id.* ¶¶ 31, 37. We noted it was "arguable defense counsel should have taken additional action to determine whether the prosecutor or Norwood was mistaken." *Id.* ¶ 31.

¶ 37 On remand, in June 2015, defendant, through appointed counsel, filed an amended postconviction petition, which substantially realleged those claims raised in his *pro se* postconviction petition. In October 2015, the State filed a motion to dismiss defendant's amended postconviction petition, which, following a November 2015 hearing, the trial court denied.

¶ 38 In April 2016, the trial court conducted a third-stage evidentiary hearing on defendant's amended postconviction petition. The court heard testimony from defendant, the prosecuting attorney on defendant's case, and defendant's trial counsel.

¶ 39 Defendant testified the first time he met Downey was when Nelson "told the court that Ed Downey was going to represent me." Defendant stated Downey, who was in the courtroom, then told the court "he was going to check and see if he had a conflict, and the [j]udge continued it for another week." Defendant testified he then met with Downey on

September 8, 2009, during which time Downey informed him he assigned Henze but she was unable to be present. Downey asked defendant for his permission to continue the matter, to which defendant responded by stating he would like to proceed with the hearing because he did not want to "toll [his] speedy trial."

¶ 40    Defendant testified Eyler told him they had a problem because Norwood made a deal with the State to testify against him. Eyler also noted the State reduced Norwood's bond from $15,000 to $6000. Defendant testified his understanding of the deal was "if Mr. Norwood testified truthfully against me, they weren't going to refer him for federal prosecution." Defendant acknowledged Eyler had not referenced federal charges when discussing the matter with him. Rather, defendant testified his understanding of the deal was based on the prosecutor's redirect examination of Norwood. Specifically, defendant testified: "[O]n redirect Mrs. Rodriguez got up and asked Mr. Norwood that question, and I—my—you know, it was like, how did she know about the federal charges?"

¶ 41    Rodriguez testified, around December 9, 2009, she became aware Norwood was in custody in the Adams County jail on state felony drug charges. Rodriguez spoke with the prosecuting attorney on Norwood's case, who indicated nothing could be offered to Norwood in exchange for his testimony against defendant. Rodriguez was informed, however, she "could tell Mr. Norwood that [the State] would not ask that the federal investigators investigate [him] for drug charges, but *** the feds or law enforcement could initiate an investigation on their own."

¶ 42    A couple days prior to defendant's trial, Rodriguez testified she spoke with Norwood at the Adams County jail. Rodriguez described the conversation as follows:

"I told [Norwood] that starting out I just wanted to make very clear to him that I wasn't there to talk to him at all about his drug charges; that I knew nothing about them and that there was no connection whatsoever between those drug charges and the case that I was prosecuting that he was the victim on. I told him that there was no connection between the two, that he wasn't being offered anything for his testimony.

He indicated that he—he understood that.

* * *

The only thing I told him, I said, you are represented by an attorney on your drug case, so I cannot talk to you about that at all. I said, the only thing I can tell you is that I did talk to [the prosecuting attorney on your case] and the State's Attorney's Office will not ask the feds to initiate an investigation against you, I said, but law enforcement and federal authorities can initiate any investigation they want to on their own initiative."

After informing Norwood the State would not refer him for federal prosecution, Rodriguez testified:

"[Norwood] looked at me like he had no idea what I was talking about. And I realized he is the victim on this case, so that probably made no sense to him, and so I didn't clarify. He didn't ask any questions. We just proceeded to talk about the case."

Rodriguez testified at no point during their conversation did Norwood ask for a deal. Rather, Norwood was "very cooperative" and "very interested in proceeding to prosecute the case because he had been shot."

¶ 43    Rodriguez testified she informed Eyler she located Norwood and gave Eyler copies of her interview notes prior to trial. She did not recall any other conversations with Eyler about Norwood.

¶ 44    During trial, Rodriguez testified she wanted, on redirect, "to make clear[ ] that I had said to him that we would not initiate a federal investigation against him." Rodriguez explained:

"[W]hen I asked him the question, I said: In return for your truthful testimony. But that is not in fact what I had said to him. I realized I misstated that question when I asked him, but his response to that was that he wasn't aware of any deal, and my belief at that time was he totally didn't even understand what I was talking about when I said we might refer it—we would not refer it to the feds for investigation, and so I just dropped it at that point because it was clear to me he didn't even understand what I had been talking about up in the jail."

¶ 45    Sometime after defendant was convicted, Rodriguez testified she learned Norwood was being transported to Springfield on federal charges. Rodriguez contacted a federal prosecutor and informed him Norwood had been very cooperative in the prosecution of defendant. She also told him no promises were made to Norwood about federal charges being filed. Rodriguez testified she did not feel she had an obligation to contact the federal prosecutor because no promises were made in exchange for Norwood's testimony against defendant. The decision was ultimately made for the Adams County State's Attorney's office to move forward on its charges against Norwood, while the U.S. Attorney's office would not move forward on its charges.

¶ 46    Rodriguez maintained no "consideration [was] given for *** [Norwood's] testimony." When asked whether she had any involvement with Norwood's bond being reduced, she stated, "Not that I'm aware of."

¶ 47    Eyler testified he informed defendant, after learning Norwood's bond had been reduced, "it was [his] belief that that probably was not a coincidence, that the reduction of the bond would have been consistent with the fact that [the State was] probably talking to him or trying to talk to him." Eyler acknowledged his belief "was absolutely based upon [his] own conjecture and speculation at that time," and he "was never told that [Norwood's] bond was reduced in exchange for his testimony." Eyler further testified he believed he received information from Rodriguez indicating "she had spoken with [Norwood] and that, as is alluded to in the transcript, he was told that for his truthful testimony he would not be referred *** for federal prosecution." Eyler acknowledged he did not receive anything in writing from the State regarding a deal or agreement with Norwood.

¶ 48    Based on the information he was provided, Eyler testified he questioned Norwood during trial about a deal with the State. Following the State's redirect examination, Eyler testified he elected not to file a motion or stipulation because:

"[I]n that moment I felt like the jury had been told, or at least given the information by Miss Rodriguez directly in terms of her questions of Mr. Norwood, to refute what that man was saying on the stand. Her questions I believe told the jury that there was something more there or that there was some discussion that this man was sitting there denying, and I felt as though her questions confirmed, essentially, my questions and told the jury what they needed to know or enough."

Eyler further explained:

"I felt as though the jury heard what they needed to hear to answer any questions they had as to why I was asking him those questions. I felt as though her questions discredited Mr. Norwood as well in terms of the answer that he had just given to mine.

At the same time, there was no—honestly, there was no other person for me to call other than the person that was sitting at the table next to me or across from me, Miss Rodriguez. We're in the middle of a jury trial, and I thought we had done enough in terms of the questions to do what we needed to do, rather than try to have a mistrial or possibly call her and raise a stink."

Eyler also testified, in order "to make [Norwood] look bad in front of the jury," he also questioned him about his prior criminal history and his ability to remember the events in question.

¶ 49   After considering the evidence and arguments of counsel, the trial court took the matter under advisement.

¶ 50   In June 2016, the trial court issued a written order denying defendant's amended postconviction petition. The court found defendant failed to show his appellate counsel provided ineffective assistance by failing to raise a violation of his statutory right to a speedy trial because the underlying claim would be meritless. Specifically, the court noted defendant conceded he was responsible for the extension from December 14, 2009, through December 17, 2009, and, therefore, the issue was whether any three-day period of delay could be attributable to defendant. The court found defendant was tried within the requisite statutory period because both the September 1, 2009, and September 8, 2009, continuances were delays properly attributed to defendant. The court also found defendant failed to show his trial counsel provided ineffective assistance by failing to perfect the impeachment of Norwood regarding a deal with the State and to show his due process rights were violated where the State failed to correct Norwood's testimony. Specifically, the court found (1) Norwood's testimony did not rise to the level of perjury or false testimony but rather merely indicated he was not aware of any consideration or agreement, (2) Rodriguez affirmatively stated the consideration in open court, and (3) any confusion existing as to the consideration rendered was sufficiently remedied by trial counsel's closing argument. The court also found defendant did not suffer any prejudice, as his counsel sufficiently attacked Norwood's credibility by highlighting his prior felony conviction as well as eliciting testimony regarding a possible felony drug conviction and the fact he was unsure if he had more than one felony conviction.

¶ 51   This appeal followed.

¶ 52                                II. ANALYSIS

¶ 53   On appeal, defendant argues the trial court erred in denying his amended postconviction petition where he made a substantial showing his (1) trial counsel provided ineffective assistance by failing to perfect the impeachment of Norwood regarding an agreement to testify, (2) due process rights were violated by the State's failure to correct Norwood's perjured testimony regarding the agreement to testify, and (3) appellate counsel provided ineffective assistance by failing to raise the violation of his statutory right to a speedy trial on appeal from his conviction and sentence.

¶ 54    The Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2014)) provides a defendant with a collateral means to challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Guerrero*, 2012 IL 112020, ¶ 14, 963 N.E.2d 909. When a case does not involve the death penalty, the adjudication of a postconviction petition follows a three-stage process. *People v. Tate*, 2012 IL 112214, ¶ 9, 980 N.E.2d 1100. Where a petition advances to the third stage of postconviction proceedings, the trial court conducts an evidentiary hearing, where fact-finding and credibility determinations may be involved. *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). At the third stage, "the defendant bears the burden of making a substantial showing of a constitutional violation." *Id.*

¶ 55    Defendant claims the trial court's denial of his amended postconviction petition was manifest error. Where a trial court's decision to deny a postconviction petition after a third-stage evidentiary hearing is based on disputed issues of fact that requires credibility determinations, we will reverse that decision only if it is manifestly erroneous. *People v. Coleman*, 183 Ill. 2d 366, 384, 701 N.E.2d 1063, 1073 (1998). " 'Manifestly erroneous means arbitrary, unreasonable and not based on the evidence.' " *People v. Ballard*, 206 Ill. 2d 151, 162, 794 N.E.2d 788, 798 (2002) (quoting *People v. Wells*, 182 Ill. 2d 471, 481, 696 N.E.2d 303, 308 (1998)). However, where a trial court's decision to deny a postconviction petition after a third-stage evidentiary hearing is based on undisputed facts, we will generally review that decision *de novo*. *People v. English*, 2013 IL 112890, ¶ 23, 987 N.E.2d 371. Typically, review of a claim of ineffective assistance of counsel involves a mixed question of law and fact, and therefore, a hybrid standard of review would apply. *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 66, 25 N.E.3d 82. When addressing such a claim, we defer to the trial court's factual findings and will disturb them only if they are against the manifest weight of the evidence but review *de novo* the court's ultimate determination of whether counsel rendered ineffective assistance. See *id.*

¶ 56    Defendant argues he made a substantial showing his trial counsel provided ineffective assistance by failing to perfect the impeachment of Norwood regarding an agreement to testify. The State disagrees, maintaining (1) the jury was adequately informed of the nature of the State's conversations with Norwood based on the questioning by the prosecutor and defendant's counsel and (2) Norwood's denial of any conversations with prosecutor did not mislead the jury but rather undermined his credibility and ability to recall.

¶ 57    To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, the defendant must show there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *People v. Makiel*, 358 Ill. App. 3d 102, 108, 830 N.E.2d 731, 740 (2005). The prejudice prong is satisfied if the defendant can show counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id.* at 108-09, 830 N.E.2d at 740. The failure to satisfy either the deficiency prong or the prejudice prong precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *People v. Houston*, 226 Ill. 2d 135, 144-45, 874 N.E.2d 23, 30 (2007).

¶ 58    The impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel. See *People v. West*, 187 Ill. 2d 418, 432, 719

N.E.2d 664, 673 (1999); *People v. Salgado*, 263 Ill. App. 3d 238, 246, 635 N.E.2d 1367, 1373 (1994). "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *West*, 187 Ill. 2d at 432-33, 719 N.E.2d at 673 (quoting *People v. Guest*, 166 Ill. 2d 381, 394, 655 N.E.2d 873, 879 (1995)); see also *Salgado*, 263 Ill. App. 3d at 246-47, 635 N.E.2d at 1373 ("[T]he *complete failure* to impeach the sole eyewitness when significant impeachment is available is not trial strategy and, thus, may support an ineffective assistance claim." (Emphasis added.)); *People v. Williams*, 329 Ill. App. 3d 846, 852-57, 769 N.E.2d 518, 523-26 (2002) (finding defense counsel's complete failure to impeach the State's witnesses regarding their prior inconsistent statements to the police amounted to ineffective assistance).

¶ 59   Here, defendant failed to show his counsel's trial strategy amounted to a complete failure to conduct any meaningful adversarial testing. As the trial court found at the evidentiary hearing, counsel attacked Norwood's credibility with his prior felony conviction as well as his possible felony drug conviction and the fact he did not know if he had other felony convictions. We also note, as testified to at the evidentiary hearing, defendant's counsel, the prosecutor, and defendant found the examination of Norwood and Norwood's responses to that examination were sufficient to raise the inference that some agreement existed between the State and Norwood. Any testimony or stipulation confirming the alleged agreement with the State would have been cumulative. See *People v. Ortiz*, 235 Ill. 2d 319, 335, 919 N.E.2d 941, 950 (2009) ("Evidence is considered cumulative when it adds nothing to what was already before the jury.").

¶ 60   Moreover, it is unlikely counsel could have perfected impeachment regarding an agreement to testify. During the evidentiary hearing, the record was clarified as to the possible evidence—or lack thereof—counsel may have offered to perfect impeachment. Defendant's counsel acknowledged he had no documentary evidence of an agreement. The prosecutor testified no agreement existed. Rather, Norwood was cooperative and interested in assisting the prosecution simply because of the injuries he sustained. The prosecutor further explained she misspoke during her redirect examination and in fact had not indicated to Norwood he would not be referred for federal investigation in return for his testimony against defendant. Given the testimony rendered at the evidentiary hearing, had defendant's counsel called the prosecutor to testify or sought a stipulation regarding an agreement, the prosecutor would have had the opportunity to inform the court and the jury she misspoke during her redirect examination and clarify defendant was not offered anything in exchange for his testimony. Defendant's failure to show evidence existed to complete impeachment on this matter is grounds alone to sustain the trial court's rejection of defendant's claim. See *People v. Anderson*, 401 Ill. App. 3d 134, 138, 929 N.E.2d 1206, 1210 (2010) ("We review the trial court's judgment, not the reasons cited, and we may affirm on any basis supported by the record if the judgment is correct.").

¶ 61   In a related argument, defendant argues he made a substantial showing his due process rights were violated by the State's failure to correct Norwood's perjured testimony regarding the agreement to testify. The State disagrees, maintaining (1) a reasonable conclusion from the record suggests Norwood was simply not aware of any alleged agreement with the State and (2) any improper testimony was remedied by the prosecutor's redirect examination.

¶ 62   The due process clause prohibits the State from knowingly eliciting, or failing to correct, false testimony from one of its witnesses. U.S. Const., amends. V, XIV; *Napue v. Illinois*,

360 U.S. 264, 269 (1972); *People v. Brown*, 169 Ill. 2d 94, 103, 660 N.E.2d 964, 968 (1995). The State's duty to correct false testimony extends to falsehoods that go "only to the credibility of the witness." *Napue*, 360 U.S. at 269. "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321, 331 (1997).

¶ 63    Here, the trial court found Norwood's testimony indicated he was unaware of any agreement to testify, and the prosecutor satisfied her duty to correct such testimony by her redirect examination. At the evidentiary hearing, the prosecutor testified Norwood "looked at [her] like he had no idea what [she] was talking about" after she told him the State would not refer him for federal prosecution. Norwood's testimony at trial and the prosecuting attorney's testimony at the evidentiary hearing support the trial court's finding Norwood was simply unaware an agreement existed. We also find the prosecutor's redirect was sufficient, to the extent such an agreement can be found to exist, to satisfy her duty to correct the testimony. Moreover, we cannot say a reasonable probability exists said testimony could have affected the jury's verdict.

¶ 64    As a final comment, defendant suggests in both of the preceding arguments Norwood's bond reduction is indicative of the existence of an agreement to testify. Defendant, who bears the burden of making a substantial showing of a constitutional violation (*Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008), has failed to show any such consideration was offered in exchange for Norwood's testimony. Rather, defendant's suggestion is wholly speculative.

¶ 65    Finally, defendant argues he made a substantial showing his appellate counsel provided ineffective assistance by failing to raise the violation of his statutory right to a speedy trial. The State disagrees, maintaining the underlying claim is meritless as (1) defendant did not seek to enforce the speedy-trial provision until September 8, 2009, and (2) any delays prior to September 8, 2009, occurred with defendant's consent.

¶ 66    "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175, 730 N.E.2d 32, 36 (2000). That is, a defendant who contends appellate counsel rendered ineffective assistance must show (1) the failure to raise an issue on appeal was objectively unreasonable and (2) that decision prejudiced the defendant. *Id.* Unless the underlying issue is meritorious, a defendant suffers no prejudice from counsel's failure to raise the issue on appeal. *Id.*

¶ 67    Section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2008)) provides, in part, as follows:

> "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he [or she] objects to the delay by making a written demand for trial or an oral demand for trial on the record."

A delay is considered to be occasioned by the defendant "when the defendant's acts caused or contributed to a delay resulting in the postponement of trial." *People v. Hall*, 194 Ill. 2d 305, 326, 743 N.E.2d 521, 534 (2000). " '[A] trial court's determination as to whether a delay is attributable to the defendant is entitled to much deference and should be sustained absent a clear showing that the trial court abused its discretion.' " *People v. Mayo*, 198 Ill. 2d

530, 535, 764 N.E.2d 525, 529 (2002) (quoting *Hall*, 194 Ill. 2d at 327, 743 N.E.2d at 535). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, or so unreasonable that no reasonable person could take the trial court's view. *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634.

¶ 68   Here, the trial court found the delays caused by both the September 1, 2009, and September 8, 2009, continuances were attributable to defendant, and thus, he was brought to trial within the requisite statutory period. Given the record presented, any argument suggesting the trial court abused its discretion in attributing these delays to defendant would be meritless. The September 1, 2009, continuance was granted "[o]n motion of [d]efendant," after (1) Nelson indicated Downey was "going to be taking [the] case," (2) Downey appeared with defendant, (3) Downey requested the matter be continued, (4) defendant indicated he understood what had occurred, and (5) Downey agreed with defendant's request he be surrendered on another charge. The September 8, 2009, continuance was granted by agreement with Downey, after (1) Downey appeared for Henze, (2) defendant requested to proceed with the preliminary hearing, (3) Downey indicated he was ready to proceed with the preliminary hearing, (4) Downey cross-examined the State's witness, and (5) Downey was given the opportunity to present argument on behalf of defendant. The affidavits of Downey and Henze garnish additional support for the trial court's attribution, both indicating Downey appeared for Henze on September 8, 2009, due to a scheduling conflict. It is clear sufficient evidence was presented by which we could not say the trial court's attribution of these delays to defendant was either fanciful, arbitrary, or unreasonable to the extent they would defy common sense.

¶ 69   Throughout the proceedings below and now on appeal, defendant contends the attribution of these delays to him was an abuse of discretion because they were caused by the withdrawal of counsel due to a conflict of interest. In support, defendant relies primarily on *People v. Collum*, 98 Ill. App. 3d 385, 424 N.E.2d 440 (1981). We find *Collum* distinguishable from the present matter. In *Collum*, it was undisputed the defendant went unrepresented during the period after the public defender's office withdrew as counsel due to a conflict of interest. *Id.* at 386-87, 424 N.E.2d at 441-42. Conversely, in this case sufficient evidence suggests defendant continued to be represented by counsel from the public defender's office during these periods of delay.

¶ 70   Because the trial court did not abuse its discretion in attributing these delays to defendant, any argument suggesting the State failed to prosecute defendant within the requisite statutory period would be meritless. Defendant failed to establish he was provided ineffective assistance by his appellate counsel's failure to raise this claim.

¶ 71                                III. CONCLUSION
¶ 72   We affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2016).

¶ 73   Affirmed.