2021 IL App (1st) 190533-U

No. 1-19-0533

Filed September 23, 2021

Fourth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 16 CR 04617 |
| MARK JONES, | ) | The Honorable William G. Lacy, |
| Defendant-Appellant. | ) | Judge, presiding |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions and sentence for three counts of criminal sexual assault affirmed when (1) the defendant's posttrial statements that his testimony "left out" that the victim had agreed to have sex with him for $150 and told him she would make his life "miserable" after he refused to pay did not trigger the trial court's duty to conduct a *Krankel* inquiry and, nonetheless, the trial court properly addressed the defendant's posttrial statements, (2) trial counsel was not ineffective for failing to impeach the victim based on the defendant's same posttrial statements, and (3) his cumulative 18-year sentence is not excessive.

¶ 2    Following a bench trial, Mark Jones was convicted of three counts of criminal sexual assault and sentenced to three consecutive terms of six years on each count for a total of 18 years.

Jones appeals, arguing that (1) his trial counsel was ineffective for failing to impeach the victim based on his claims the victim had agreed to have sex with him for $150 and stated she would make his life "miserable" after he refused to pay, (2) the trial court erred by not conducting an inquiry pursuant to *People v. Krankel* when the defendant informed the court after trial that he had told his attorney about the same, and (3) his sentence is excessive. Finding his contentions to be without merit, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4        At trial, S.M. testified her first contact with Jones occurred when they exchanged messages on Facebook. On March 3, 2016, they had a three-hour telephone conversation. During the call, Jones invited S.M. to visit him in person on her way home from an errand. After she arrived, they sat and talked in Jones's bedroom since the small, second-floor apartment did not have a living room. Jones sat on his bed and S.M. sat on a chair. Jones introduced S.M. to his roommate, Mozella Griffin,[2] an older, disabled woman who also lived there. Jones offered S.M. a Pepsi, and he started drinking a beer.

¶ 5        After talking for a while, Jones tried to kiss S.M. but she turned her head to avoid him. Twice, Jones put his hand on her thigh, and each time she moved his hand away. Then, Jones's facial expression became "spooky" and his demeanor aggressive. Jones grabbed both of S.M.'s legs from behind her knees and pulled her onto the bed. S.M. asked Jones what he was doing and begged him to stop. Jones became more aggressive and struck her cheek with his fist. Jones proceeded to remove S.M.'s bottom layers, leaving her unclothed from the waist down. Next, Jones hit and forced S.M.'s legs apart, which she had been holding together, then inserted his fingers

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] S.M. testified Jones introduced Mozella as his aunt. Both Jones and Mozella later testified she is not related to Jones, but he treated her like an "auntie."

into her vagina. S.M. continued to tell Jones to stop. Ignoring her, he ordered S.M. to remove her top layers until a camisole was the only article of clothing S.M. was wearing. Jones then tried to insert his penis in her vagina. He made contact, but only lightly penetrated her since he was not fully erect. Jones did the same to S.M.'s anus with the same result.

¶ 6       Jones was causing S.M. pain. She wanted to get away but was afraid Jones would not allow her to leave. She suggested that Jones get some oil to "make it easier." Jones reached for a bottle of lotion in the room. S.M. told him the lotion would burn. Jones started walking toward the bathroom but stopped and told S.M. to come with him and she complied.

¶ 7       From the bathroom, while Jones searched for the oil, S.M. surveyed the front door and its lock. Suddenly, Mozella opened the door to her room. S.M. "instinctively took off" to the front door. She unfastened the lock, exited the apartment, and ran down the stairs and out of the building. S.M. was clothed only in her camisole. It was cold and snowing outside. S.M. began knocking on doors until a woman located two blocks away opened her door. The woman allowed S.M. inside her home, gave her a blanket, and called 911.

¶ 8       Police officers and an ambulance arrived and transported S.M. to a hospital where she agreed to undergo the procedures for a sexual assault kit. The following day, S.M. identified Jones in a photo array. She also provided police with his name, described the location of his apartment, and where she had parked her car.

¶ 9       At trial, S.M. identified photographs of Jones's apartment building, door, bedroom, and bedding. Blood was visible on the sheets. S.M. testified she had bled because she was menstruating at the time.

¶ 10       On cross-examination, S.M. testified she accepted Jones's "friend request" on Facebook because they had a mutual friend. She thought Jones was well dressed in his profile photograph

and "okay looking." S.M. admitted she sipped some vodka and smoked marijuana that Jones offered her. S.M. explained she did not feel threatened or try to leave after Jones tried to kiss her or put his hand on her thigh because "men do that." But when Jones started grabbing her legs, she felt it was time for her to go and she told him so. S.M. tried to pull away but Jones pinned her after pulling her onto the bed. S.M. explained she did not scream or yell for help because she thought it would only provoke Jones to be more violent since he had already hit her when she told him to stop. She further explained that Jones had not hit her hard and his punch did not cut or bruise her face.

¶ 11       Jeanine Ntihirageza testified she is a professor of linguistics at Northeastern Illinois University and was up late working on a paper in her home when she heard the doorbell ring. She opened the door and found S.M., who she did not know, frantic, crying, and clothed only in a camisole. S.M. said she had been raped and asked Jeanine to call the police. Jeanine admitted S.M. inside and grabbed a blanket for S.M. to cover herself as she sat on the couch. Jeanine dialed 911 and handed her phone to S.M. Police officers and an ambulance arrived. S.M. left with them.

¶ 12       Mona Harris, a registered nurse, testified she treated S.M. in the emergency room at Jackson Park Hospital in the early morning hours of March 4, 2016. Harris described S.M. as upset and crying. S.M. reported that she had been sexually assaulted by a male who penetrated her vaginally and rectally with his penis and vaginally with his finger. S.M. also related that he slapped her softly on the face and held her down during the assault. Harris documented S.M.'s statements in medical records. Harris also collected specimens as part of a sexual assault kit.

¶ 13       On cross-examination, Harris clarified that S.M. described being struck with a soft slap and not a closed fist. Nor did she mention being hit on the legs. Harris stated she had conducted between 150 and 200 sexual assault kits throughout her career. She agreed that sexual assault kits

cannot determine whether sex was consensual: such kits are performed only when a patient reports they have been sexually assaulted.

¶ 14        For the defense, Mozella Griffin testified she is disabled and shared an apartment with Jones where he served as her aid. On the evening of March 3, 2016, S.M. came to the apartment and Jones introduced Mozella as his "auntie." Jones and S.M. were drinking in Jones's bedroom as Mozella went to her room to watch television. A short time later, Jones entered Mozella's room and asked her for a "joint," which she provided. Jones left the door to his room "cracked open," but Mozella could not see into his room from where she was sitting. She could hear Jones and S.M. talking and laughing. She did not hear any yelling or screaming.

¶ 15        Later, Mozella observed S.M. leave Jones's bedroom and enter the bathroom. She testified S.M. was fully clothed and entered the bathroom alone while Jones remained in his room. Then, Mozella testified, S.M. left the bathroom and exited the apartment still clothed. S.M. was not crying and Mozella did not observe any bruises on her face. Mozella heard S.M. knocking on the door of a downstairs neighbor. Jones asked Mozella where S.M. was. Mozella replied, "she gone."

¶ 16        Mark Jones testified he began communicating with S.M. through Facebook. In their messages, S.M. told Jones she thought he was "kind of handsome and sexy" after viewing photos of him wearing suits on Facebook and learning he was a radio personality. After exchanging phone numbers, they had a conversation that, according to Jones, turned sexual. He testified it began when S.M. told him he was a "nice dresser." Jones started "boasting," telling S.M. he was "very well endowed" and "could do some things to make her toes curl up." S.M. giggled and said he would have to "prove it." Jones replied there was only one way to "find out." He invited S.M. to come over and "kick it" since he was on house arrest. To Jones, having sex was the "primary reason" S.M. came to his apartment.

¶ 17        Upon S.M.'s arrival, Jones escorted her to his bedroom where they sipped drinks, talked, and laughed. Jones introduced S.M. to Mozella, who then returned to her room. They smelled marijuana and S.M asked Jones for a joint, which he retrieved and S.M. smoked. Eventually, Jones and S.M. started "touching and feeling each other." He testified S.M. seemed receptive to the physical contact. Then, according to Jones, they were "getting in the mode" of "let's make this happen" and started undressing. Jones testified S.M. removed her clothing without his help and moved onto his bed. Then, he testified, S.M. started massaging his penis until he ejaculated. S.M., his testimony continued, next started rubbing his penis between her buttocks, and "it kind of went in her [anus]." Jones said he told her he did not like that position, so they turned to the side. Jones claimed that S.M. asked him to make her "wet" so he "caress[ed]" her vagina with his fingers and S.M. sounded like she was enjoying it. Jones thought he was "doing a good job" and S.M. was "into it," until he noticed blood on his sheets. Jones asked S.M., "what was up with that" and she explained that she was menstruating. Jones testified he then said, "why would you come over to my house like that?" S.M. did not respond but "rushed" to get dressed and went into the bathroom where she remained for ten minutes. Mozella came to her door across from Jones's door and asked about S.M. S.M. then exited the bathroom and went out the front door. Ten minutes after S.M. left, police arrived and arrested Jones.

¶ 18        At trial, Jones denied that he ever struck S.M. He also denied that S.M. ever told him to stop, pushed him, or did anything to resist the physical contact. Jones further denied that his penis ever penetrated S.M.'s vagina or anus.

¶ 19        On cross-examination, Jones admitted that S.M. left her boots, keys, wallet, and cell phone behind in his room when she left the apartment. He asserted she did so because "she was high." Jones acknowledged that he told detectives he and S.M. did not have sex when first interviewed.

He explained that he interpreted the question to solely concern vaginal intercourse since that is what he considers "sex" to mean. Similarly, Jones admitted he told detectives that he did not have any physical contact with S.M. but explained he understood their questions to be asking about a physical fight. Likewise, Jones admitted he told detectives that S.M. left his apartment fully clothed but explained he meant she was only wearing her base layer with other clothes left behind. Jones also acknowledged he was wearing S.M.'s t-shirt when he was interviewed by detectives.

¶ 20   In rebuttal, Detective Eddie Galloza testified Jones was arrested at 12:28 a.m. on March 4, 2016. Detective Galloza and Detective Albert Thomas interviewed Jones at 7:20 a.m. at Area Central. In the interview, Jones stated that he and S.M. never had sex and he never saw S.M. remove any clothing. He did not tell the detectives that he touched S.M.'s vagina with his fingers. Detective Galloza interviewed Jones a second time at 1:58 a.m. on March 5th. Jones related that he and S.M. had a lengthy phone conversation before she came to his apartment. The topic included their children, S.M.'s breakup, and that Jones was an on-air radio personality and attending Kennedy-King College. Jones's account of the phone conversation did not include that he told S.M. he was well-endowed or that they discussed "kicking it." Jones also stated that he did not remember having any physical contact with S.M., but they "may have kissed."

¶ 21   After closing arguments, the court took the matter under advisement. In assessing Jones's credibility, the court stated:

> "I was able to observe the defendant's demeanor and manner while testifying. He avoided answering questions, he vacillated again even when asked by his own attorney he would make statements totally unrelated to the questions that were asked of him, and he was again severely impeached by his prior statements to police."

Regarding S.M.'s testimony, the court remarked:

"Conversely, [S.M.] testified in a clear, concise, and credible fashion. She testified ['[blemishes and all.['] By that I mean she admitted to drinking some vodka and smoking some marijuana. Her testimony is corroborated by her actions and other credible witnesses presented that being Ms. Jeanine [Ntihirageza]. *** After escaping the defendant's apartment, [S.M.] went outside knocking on doors down the street on a cold night with snow on the ground begging for help. She had nothing on but a camisole. She was unclothed below the waist.

These are not the actions of someone who had just engaged in consensual sex. *** [S.M.]'s outcry regarding this *** sexual assault was immediate and to Ms. Jeanine.

She told Ms. Harris the same account of her sexual event during the course of her medical treatment. Both women described [S.M.] using words such as frantic, scared, jumpy, emotionally upset and crying. In fleeing the defendant's apartment, she left behind her phone, her car keys, her wallet, her boots.

Again, not the actions of a person who had just experienced a consensual sexual event."

Ultimately, the court found Jones guilty of three counts of criminal sexual assault.[3]

¶ 22        At a later hearing, Jones's counsel offered arguments in support of his motion for new trial. At the conclusion of his remarks, counsel added, "there were some relevant facts which the trier of fact should have been made aware of at trial ***." The court denied the motion for new trial stating in part:

"I can only decide cases on facts that are presented to the Court. Mr. Jones did testify. He did testify freely. He testified[—]while he was not always responsive to the

---

[3] The court found the State had not proven bodily harm and, therefore, found Jones not guilty on the three counts of aggravated criminal sexual assault in the indictment.

questions[—]he pretty much said whatever he wanted to say while he was on the witness stand ***."

¶ 23    The State then offered arguments in aggravation for sentencing and read S.M.'s written victim impact statement. The defense offered arguments in mitigation. The court then asked Jones if he wished to be heard before the court imposed a sentence. Jones began, "I would like to state that I left out some very important testimony." The court interjected that sentencing was the matter under current consideration but allowed Jones to proceed. Jones continued, "I met her on an underground page of Facebook. It was for adults only. *** [W]e agreed to have sex for money. *** [W]e agreed for $150 for her to come over to my house and have sex." He added, "my attorney knew this from day one when I hired him." The court noted that Jones had the opportunity to testify yet "told a different story." Jones explained:

> "I know there was so much reasonable doubt in the case that I didn't even bring it up. I didn't want to embarrass myself, but that's what this case was all about[:] her coming over to my house because like me and her agreed for me to pay her for sexual favors ***."

Jones continued:

> "I told her I wasn't going to pay her because it was a raw deal *** and she told me that she would make my life miserable if I didn't pay her."

Returning to why he did not testify to this at trial, Jones stated:

> "I was naïve and I didn't testify to that when I was on the stand because I never been on the stand before *** silly me that I didn't ***."

¶ 24    In response, the court stated:

> "[T]he story that you've told today is as absurd and ridiculous as the story that you told at the time of trial. It's absurd. I watched you on the witness stand. You were free[-

wheeling] up here. You weren't responding to questions, you were not responsive to your own attorney's questions, you were saying whatever you wanted to say. You had every opportunity to present this silly story that the victim in this case was a prostitute. You are incredible. You are a liar ***. That was my assessment at the time of trial. It is my assessment as I sit here today."

¶ 25    The court then imposed sentences of six years' imprisonment on each of the three counts of criminal sexual assault, which, by statute, must be served consecutively. This appeal followed.

¶ 26    On appeal, Jones argues his counsel was ineffective for failing to impeach S.M.'s testimony by showing that she agreed to have sex with him for $150 and told him she would make his life miserable when he did not pay. Jones also argues the trial court did not conduct the required inquiry when he informed the court at sentencing that he had told his lawyer about the sex-for-money agreement and S.M.'s threat. Lastly, Jones claims his 18-year aggregate sentence is excessive.

¶ 27                                II. ANALYSIS

¶ 28                        A. Trial Court's *Krankel* Inquiry

¶ 29    We first address Jones's second claim that the court did not conduct a sufficient inquiry based on his posttrial statements.

¶ 30    Beginning with *People v. Krankel*, 102 Ill. 2d 181 (1984), the Illinois Supreme Court has developed a common-law procedure governing *pro se* posttrial claims of ineffective assistance of counsel. *People v. Jackson*, 2020 IL 124112, ¶ 95. The procedure "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims [citation] and is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." (Internal quotation marks omitted.) *Id.* (quoting *People v. Patrick*, 2011 IL 111666, ¶¶ 39, 41).

The *Krankel* procedure " 'is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel.' " *Id.* ¶ 96 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 29). But such a defendant does not have an automatic right to the appointment of new counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. Rather, the defendant's claim " 'requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel.' " *Id.* (quoting *People v. Moore*, 207 Ill. 2d 68, 79 (2003)). "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." (Internal quotation marks omitted.) *Id.* (quoting *Moore*, 207 Ill. 2d at 78).

¶ 31    A *pro se* defendant need only bring the claim to the trial court's attention and may raise the issue orally. *Jackson*, 2020 IL 124112, ¶ 96. However, to trigger the circuit court's duty to conduct a *Krankel* inquiry, the defendant must clearly indicate that they are complaining about their attorney's performance. *People v. Taylor*, 237 Ill. 2d 68, 77 (2010). An "implicit" claim of ineffective assistance is insufficient. *Id.* at 76-77.

¶ 32    Here, Jones did not clearly complain about his attorney's performance. Although he mentioned that he had told his lawyer "from day one" about the sex-for-money agreement, Jones's statements are amenable to more than one interpretation. *Cf. Id.* at 77 (finding defendant's statement did not trigger the trial court's duty to conduct a *Krankel* inquiry when he did not specifically complain about his attorney's performance and the statement was "amenable to more than one interpretation"). Indeed, Jones attributed the omissions from his testimony to his own "naïve" decision based on (1) his desire to avoid embarrassment from admitting he agreed to pay a woman for sex and (2) his confidence that the court would find reasonable doubt of his guilt

without such testimony. Apart from claiming ineffective assistance, Jones's statements show that, after being found guilty, he was attempting to supplement or change his testimony in the hope that the court would reverse its finding of guilt or grant him a new trial so he could testify differently. The record does not indicate that Jones was specifically complaining about his attorney's performance. Accordingly, Jones's statements did not trigger the trial court's duty to conduct a *Krankel* inquiry.

¶ 33     Even so, we find the trial court acted properly. Under *Krankel*, a trial court's inquiry is adequate when " 'sufficient to determine the factual basis of the claim.' " *Ayres*, 2017 IL 120071, ¶ 11 (quoting *People v. Banks*, 237 Ill. 2d 154, 213 (2010)). In this case, the factual basis of the claim was largely manifest from Jones's statement itself and the trial record. Though the trial court did not respond with questions phrased as such, the judge's remark that Jones was permitted to testify and gave a different story naturally prompted Jones to try to explain why he omitted the sex-for-money and related testimony. No further inquiry was required for the court to ascertain the information needed to determine whether the claim lacked merit, pertained to trial strategy, or showed possible neglect.

¶ 34     To be sure, the trial judge noted reasons that the claim was meritless. The court noted that Jones had the opportunity to testify and that his attorney's questions did not inhibit Jones from testifying differently as his testimony was often unresponsive to the questions asked. Moreover, the trial judge found that Jones was not credible as he gave different accounts when he was interviewed by detectives, at trial, and then at sentencing. Thus, even if we were to construe Jones's statements at sentencing as a *pro se* claim of ineffective assistance, we reject that the trial court failed to comply with the *Krankel* procedure.

¶ 35                              B. Failure to Impeach Victim

¶ 36    Jones claims that his trial counsel provided ineffective assistance by failing to impeach S.M. with a prior inconsistent statement shown in a police report that S.M. said Jones had punched her in the face multiple times, rather than once as she testified at trial. He contends the prior statement would have also reduced her credibility since a claim that she was punched multiple times in the face is belied by her lack of injury. More significantly, Jones claims that his trial counsel should have impeached S.M. by questioning her about agreeing to have sex with Jones in exchange for $150 and regarding her statement that she would make Jones's life miserable after he refused to pay her.

¶ 37    To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense. *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Prejudice is shown by a reasonable probability that the result of the proceeding would have been different, but for counsel's errors. *Id*. at 326-27. To establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *Id*. at 327. Matters of trial strategy generally cannot support an ineffective assistance claim. *Id*.

¶ 38    "[C]ounsel's choice as to which theory of defense to present and the manner in which to question witnesses constitute matters of trial strategy." *People v. Little*, 2021 IL App (1st) 181984, ¶ 52. Thus, the impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel. See *People v. West*, 187 Ill. 2d 418, 432 (1999). "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *Id.* at 432–33 (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). An example of such would be "the complete failure to impeach

the sole eyewitness when significant impeachment is available." *People v. Salgado*, 263 Ill. App. 3d 238, 246-47 (1994).

¶ 39    Here, we cannot conclude that counsel's cross-examination of S.M. was so unsound as to not subject her testimony, or the State's case more broadly, to meaningful adversarial testing. To the contrary, counsel's cross-examination of S.M. elicited several facts that were helpful to a consent theory including that: she accepted Jones's "friend request" on Facebook, gave him her phone number, voluntarily entered his bedroom, did not leave when he tried to kiss her or put his hand on her thigh, did not scream or yell, did not sustain any cuts or bruises despite testifying Jones had punched her with a closed fist, and she admitted to drinking vodka and smoking marijuana while she was with Jones in his bedroom. Accordingly, Jones cannot overcome the presumption that counsel's cross-examination of S.M. was sound trial strategy, and, consequently, he cannot establish deficient performance.

¶ 40    We note that the police reports and grand jury transcript attached to Jones's brief and upon which he relies to assert S.M. made a prior inconsistent statement were not part of the trial record. A party may not rely on matters outside the record to support its position on appeal. *Keener v. City of Herron*, 235 Ill. 2d 338, 346 (2009). Yet, even if those materials were properly before this court, Jones's claim would fail because this was a matter of trial strategy.

¶ 41    We also observe that Jones's claim that his trial counsel was ineffective for failing to impeach S.M. essentially reframes his *Krankel* claim as the two go hand in hand. Jones argues that counsel should have questioned S.M. about the agreement to have sex in exchange for $150 and that she threatened to "make [his] life miserable" when he refused to pay. But questioning a witness about facts that contradict their testimony is only one aspect of impeachment. Counsel must have a good faith basis for the questions propounded to a witness on cross-examination and,

importantly, the intent and ability to complete impeachment of the witness's denial by proving up the contrary. Michael H. Graham, Graham's Handbook of Illinois Evidence § 607.3 (2021 ed.). If Jones's counsel had begun to question S.M. about the prostitution theory, it would have almost certainly drawn an objection from the State. To be permitted to continue the line of questioning, Jones's counsel would have had to proffer some evidence showing a good faith basis for the questions and his intent and ability to complete impeachment by proving up the money-for-sex agreement if S.M. denied it. The only plausible evidence to satisfy those conditions would have been Jones's own testimony. Thus, for his counsel to have impeached S.M., Jones would have also had to testify to the money-for-sex agreement. As a further consequence, our inquiry whether prejudice resulted from the failure to impeach S.M. requires Jones to show that his testimony would have been credible enough to create a reasonable probability of a different outcome. *Cf. People v. Phillips*, 2017 IL App (4th) 160557, ¶ 60 (stating that a defendant's inability to show impeachment could have been completed with other evidence "is grounds alone" to reject his ineffectiveness claim premised on failure to impeach a witness). That same issue underlies Jones's *Krankel* claim. To accord with *Strickland*, an assertion of a reasonable probability of a different outcome had counsel elicited Jones's testimony about the money-for-sex agreement necessarily follows from an ineffectiveness claim premised on the allegation that counsel was aware of but failed to elicit that testimony. Thus, Jones's *Krankel* and ineffectiveness claims are two sides of the same coin: both depend on the credibility of his testimony about the money-for-sex agreement.

¶ 42    Consequently, we can look to the trial court's treatment of Jones's posttrial statements in our analysis of this claim. As we explained, the trial court conducted a sufficient inquiry and addressed the merits of Jones's posttrial statements on this issue despite the trial court having no duty to do so since Jones did not specifically complain about his trial counsel's performance. The

trial court can consider the merits of a defendant's *pro se* claim in its entirety in a preliminary *Krankel* inquiry. *People v. Roddis*, 2020 IL 124352, ¶ 61. In addition, "the trial court is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Ayres*, 2017 IL 120071, ¶ 12. "The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims." *Roddis*, 2020 IL 124352, ¶ 56. "[I]f the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *People v. Jackson*, 2020 IL 124112, ¶ 98.

¶ 43        As we noted, the trial court found that Jones's claims that S.M. had agreed to sex for $150 and threatened him when he refused to pay were not credible. The trial court, having familiarity with the trial evidence, including firsthand observation of both S.M. and Jones's testimony, was best suited to assess the credibility of Jones's posttrial assertions. Additionally, as the trial court stated, Jones twice gave inconsistent accounts: first, to detectives after his arrest and, second, when he testified at trial. As the trial court further observed, trial counsel did not prevent Jones from testifying as he wished. In our review of the trial transcript, we find the trial judge's characterization apt. Jones could have testified about a sex-for-money agreement in response to his counsel's questions. Even so, Jones demonstrated he was unconfined by his counsel's questions as his responses often gave unresponsive narrative. Jones was also evasive on cross-examination. Thus, the record supports the trial judge's assessment that Jones was not credible at trial or in his posttrial statements. Apart from that, S.M.'s actions in leaving her clothing and belongings behind, running nearly naked on a cold night to find help, and making an immediate outcry consistent with her trial testimony belie the credibility of Jones's posttrial account of retaliation for an unpaid act

of prostitution. For these reasons, we do not find that the trial judge's determination that Jones was not credible was manifestly erroneous. As a further consequence, we cannot find that counsel could have completed impeachment of S.M. and, thus, a reasonable probability of a different outcome. Jones's claim of ineffective assistance is without merit.

¶ 44                                        C. Sentencing

Lastly, Jones argues that his 18-year sentence is excessive. He contends the trial court abused its discretion by imposing this sentence because Jones had no significant criminal history and the court did not give proper weight to other mitigating factors, including that (1) Jones was 47-years old, (2) had two adult children and one grandchild, (3) was working toward an associate's degree, (4) had aspirations to work in television and radio, and (5) several people provided letters of support. Jones requests that we reduce his sentence to the minimum of four years on each count for a total term of twelve years, as the terms are required by statute to be served consecutively.

¶ 45         We review the trial court's sentencing decision for an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 211 (2010). A sentence is considered an abuse of discretion where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.* The trial court has broad discretion when imposing a sentence, and its sentencing decisions are given great deference because the trial judge, having observed the defendant and the proceedings, is in a better position to consider the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *Id*. at 212-13. We presume that the trial court considered all relevant factors and any mitigation evidence presented. *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 55.

¶ 46         A sentence within statutory guidelines is presumptively valid. *People v. Hauschild*, 226 Ill. 2d 63, 70 (2007). "The phrase 'excessive sentence' is reserved for a sentence within the statutory

range but without regard for a particular defendant's rehabilitative potential." (Internal quotation marks omitted.) *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 71. Here, each of Jones's criminal sexual assault counts carried a prison term of four to fifteen years as a class 1 felony. 720 ILC 5/11-0.1 (West 2016); 730 ILCS 5/5-4.5-30 (West 2016). The terms must be served consecutively. 730 ILCS 5/5-8-4(d)(2) (West 2016). The trial court sentenced Jones to two years over the minimum on each count. Before imposing sentence, the court stated that it had reviewed and considered the presentence investigation report, all statutory factors and arguments in aggravation and mitigation, and Jones's allocution. The court commented that he wondered whether the authors of the letters in support really knew Jones. The court also indicated that Jones's lack of prior convictions made the court withhold a more severe sentence.

¶ 47    In our review of the record, we cannot conclude the trial court abused its discretion. A sentence should reflect the "seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Jones*, 2015 IL App (1st) 142597, ¶ 38. But the most important factor in sentencing involves the seriousness of an offense, not mitigating evidence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. The seriousness of the offense here is great. "Rape is unlike other offenses: with each act, the victim's psychological constitution and most intimate part of her being have been violently invaded." *People v. Segara*, 126 Ill. 2d 70, 78 (1988). The existence of mitigating factors does not require the trial court to sentence close to the minimum. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). That said, the six-year terms imposed were far closer to the minimum of four than the maximum of fifteen. Ultimately, Jones asks us to reweigh the mitigating factors and substitute our judgment for that of the trial court, which we will not do. See *Jones*, 2015 IL App (1st) 142597, ¶ 40.

¶ 48                                      III. CONCLUSION

¶ 49        For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 50        Affirmed.