2024 IL App (1st) 191825-UB

Third Division
June 26, 2024

No. 1-19-1825

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 11 CR 18454 (03) |
| JAMAL STREETER, | ) ) ) | Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirming the summary dismissal of defendant's postconviction petition where it failed to sufficiently allege that (1) defendant received ineffective assistance of trial counsel, (2) defendant received ineffective assistance of appellate counsel, (3) defendant's sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution, and (4) defendant's sentence was disproportionate to his co-defendant's sentence.

¶ 2    Defendant appeals the summary dismissal of his postconviction petition for relief

pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)).

Defendant argues that the trial court erred in summarily dismissing his petition, asserting it

sufficiently alleged that (1) defendant received ineffective assistance of trial counsel, (2) defendant received ineffective assistance of appellate counsel, (3) defendant's sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution, and (4) defendant's sentence was disproportionate to his co-defendant Vito Richmond's sentence.

¶ 3    We initially considered defendant's claims in a Rule 23 order issued in 2022, ultimately affirming the trial court's judgment. *People v. Streeter*, 2022 IL App (1st) 191825-U. In early 2024, however, the supreme court denied defendant's petition for leave to appeal but issued a supervisory order, directing this court to vacate its judgment and "consider the effect of [the supreme court's] opinion in *People v. Hilliard*, 2023 IL 128186, ¶ 29 on the issue of whether defendant may challenge his sentence under the proportionate penalties clause where the sentence is not a *de facto* life sentence and determine if a different result is warranted." *People v. Streeter*, No. 128792 (Ill. Jan. 24, 2024) (supervisory order). We vacated our earlier judgment, as directed, in a separate order dated March 6, 2024, and permitted the parties to submit supplemental briefs on the matter. After considering the effect of the supreme court's recent decision in *Hilliard*, we continue to affirm the trial court's judgment in full.

¶ 4                              BACKGROUND

¶ 5    On August 3, 2011, Darius Brown (Brown) was shot and killed in Metcalfe Park located on South State Street in Chicago. During the shooting, the same shooter shot at Steve Barron (Barron), but he was not struck by any bullets. Defendant, who was 18 years old at the time of the shooting, and co-defendants Aramis Beachem (Beachem) and Vito Richmond (Richmond) were charged by indictment with first degree murder of Brown (720 ILCS 5/9-1(a)(1), 9-1(a)(2), 9-1(a)(3) (West 2010)), attempted first degree murder of Barron (720 ILCS 5/8-4(a) (West

2010)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)).[1] At trial, the jury found defendant guilty of the first degree murder of Brown and not guilty of the attempted murder of Barron. The jury further found that the State had failed to prove that defendant had used a firearm in the commission of the offenses.

¶ 6                                          A. Pretrial Proceedings

¶ 7      Prior to trial, defendant filed a motion to suppress his statements to the police following his arrest. In his motion, defendant asserted his statements should be excluded because (1) defendant's statements to the police were taken after he had expressed his desire to stop communicating to the police, in violation the United States Constitution and Illinois Constitution, and (2) the police denied defendant's repeated requests to call his family, in violation of section 103-3 of the Code of Criminal Procedure (Code) (725 ILCS 5/103-3 (West 2010)).

¶ 8      At the suppression hearing, defendant testified that on October 12, 2011, he was arrested and placed in custody at a police station. Defendant acknowledged that he was advised of his *Miranda* rights, understood his *Miranda* rights, and agreed to communicate with the police. Defendant also testified that when he had repeated his account of the offense three or four times, he said he was "done talking." The police, however, continued to question him. Thereafter, defendant stated on several occasions, "I've already told my story," "I'm done," and "I don't wish to talk more, I have nothing else to say." Defendant testified that the police continued the questioning on each of these occasions. Defendant further testified that at one point during an interview, a detective asked, "Do you have anything more to say?" Defendant testified that he did not say anything and that he shook his head from side to side. Defendant further testified that he asked eight different police officers whether he could call his sister, Passion Jordan (Jordan),

---

[1] Defendant is the only party to this appeal.

but he was not allowed to do so until he arrived at the Cook County Jail.

¶ 9    Chicago police detective Daniel Stanek (Detective Stanek) testified that, on the day prior to the offenses in question, an individual matching defendant's description fired a firearm on South Michigan Avenue. This individual was with Jordan at the time of the shooting. Detective Stanek further testified that he interviewed defendant at the police station. During the interview, defendant asked to call his sister Jordan on several occasions. Detective Stanek also testified that at one point during the interview, he and his partner asked defendant why he wanted to call his sister. Defendant answered he wanted her to know where he was. Detective Stanek testified that he had, in fact, contacted Jordan and communicated with her over the phone on numerous occasions. After Detective Stanek informed defendant that his sister was aware of where he was, defendant stopped asking to call her. Detective Stanek testified that defendant never asked for an attorney.

¶ 10    Following Detective Stanek's testimony, the parties rested. The circuit court then reviewed portions of an electronically recorded interview (ERI) that had been admitted into evidence. After hearing oral arguments and reviewing portions of the ERI video recording, the circuit court denied defendant's motion to suppress his statements.

¶ 11                                B. Trial Proceedings

¶ 12    The matter proceeded to a three-day jury trial. At trial, Barron testified that in 2011, he was affiliated with the Welch World street gang. A few weeks prior to the shooting on August 3, 2011, Richmond and defendant approached Barron and asked if he was affiliated with Welch World. The two men indicated they would "jump" Barron as the two men had "just took a loss." Barron understood this to mean that defendant's sister Princess Streeter (Princess) had died. She was a member of the 37th Avenue Boys street gang and had been shot as part of a gang dispute

between Welch World and the 37th Avenue Boys. Barron ran away.

¶ 13    Barron further testified that on the evening of the shooting, he was at Metcalfe Park on South State Street playing basketball with Brown. Barron had a red Washington Nationals cap and a tattoo of a "W" on the back of his right hand, which indicated he was a member of Welch World. During the game, Barron heard four or five shots behind him and started running. Brown, who was running next to him, "said he got hit." Barron then observed an automobile which he identified as a gray Charger driving southbound on State Street. He could not identify anyone inside the vehicle. The following day, Barron informed the police he had heard shots and ran during the incident.

¶ 14    Chicago police sergeant Jose Lopez testified as a gang expert. In August 2011, the 37th Avenue Boys and Welch World engaged in a series of shootings and retaliation shootings. Defendant's sister Princess was killed as a result of this conflict.

¶ 15    On the third day of the trial, a deputy sheriff informed the trial court that several jurors expressed concerns that when they arrived and departed from the courthouse, people were pointing at  them, staring at them, and "watching other jurors come in." Thereafter, the trial court brought into chambers all the jurors who expressed concerns. One juror, M.L., stated that "I feel like I'm going to cry right now" and that "[i]t makes me very nervous that whatever we decide, one side obviously is going to be really unhappy ***." Another juror, J.B., stated that when the jurors left on the second day of trial, people were waiting for the jurors to walk by. J.B. further explained that a young lady made a face at the jurors and that another person stated that "I think that's one [of] them right there." J.B. asserted that these people were from Brown's family. The trial court stated that the jurors were safe, assuring them that nothing was going to happen to them. The trial court excused the jurors from his chambers.

¶ 16 After excusing this group, the trial court then brought back into chambers, one by one, each juror who expressed concerns. Each juror indicated that they could be fair. Specifically, when asked if she could be fair to both sides, M.L. stated that she could be fair. M.L. stated that she was scared but was not biased toward either side. Similarly, when asked if she could be fair, J.B. stated, "Yes, I am fine."

¶ 17 Subsequently, the trial court addressed all the jurors in open court, assuring them they were safe and asking them to raise their hand if they could not "put anything that you've heard aside and judge this case by the facts and evidence that you hear in this courtroom." No juror raised his or her hand. The trial judge then proceeded to conduct the trial.

¶ 18 Chicago police detective Robert Garza (Detective Garza) testified that on the day after the shooting, he interviewed Barron at the police station. During the interview, Barron mentioned defendant and Richmond. Barron also indicated he had observed a Charger that was possibly involved in the shooting. Thereafter, on October 12, 2011, defendant, Richmond, and Beachem were arrested and placed in custody. Their entire interviews were recorded electronically.

¶ 19 Assistant State's Attorney (ASA) Kelly Grekstas testified that on October 14, 2011, at approximately 11 a.m., she started interviewing defendant. ASA Grekstas testified that she interviewed defendant for approximately 46 hours. Detectives Scott Reiff and Stanek were also present for various parts of the interview. Prior to questioning defendant, ASA Grekstas informed defendant of his *Miranda* rights and that the interview was being recorded by an ERI video surveillance system. The ERI video recording was admitted at trial.

¶ 20 In the video recording, defendant stated that on the afternoon of the shooting, he was at Jordan's apartment located on South Michigan Avenue. He was with Richmond, Beachem, Beachem's brother "Vince," Beachem's girlfriend Michelle Lawrence (Lawrence), and

Beachem's friend "C4."[2] Beachem informed him they were going to "fire the park up." Defendant understood this to mean that Beachem would "shoot the park up." Beachem was already inside Vince's Charger. He had a silver .45-caliber handgun that defendant had not seen before. Beachem handed the handgun to defendant. Defendant entered the vehicle and passed the handgun to Richmond, who was in the back seat. Richmond already had a "three-eighty" handgun with 9-millimeter shells in it. He said, "I already got a gun." Defendant responded, "[D]on't use that jinky *** gun." Defendant knew Richmond would shoot the handguns at the park.

¶ 21    Vince drove the Charger with defendant and Richmond to Metcalfe Park. Lawrence drove her white Nissan with Beachem and C4 as passengers and followed the Charger to the park. When the Charger was a block or two away from the park, defendant and Richmond covered their faces with t-shirts. The Charger slowed down when they arrived at the park but defendant did not observe anyone he recognized as a member of Welch World. He informed Richmond, who responded, "I'm [gonna] show y'all what I'm about." He then put both of his arms out of the vehicle window and started firing the .45-caliber handgun and the "three-eighty" handgun. Defendant heard the .45-caliber handgun stop shooting but the "three-eighty" handgun continue firing. When the shooting stopped, Vince drove away with defendant and Richmond. Defendant did not observe anyone being shot.

¶ 22    Shortly thereafter, defendant, Richmond, and Vince returned to the building on South Michigan Avenue. Richmond still had the two handguns. He also found out on the news that an individual had been killed during the shooting.

¶ 23    During the presentation of defendant's interrogation video, defendant's uncle, Earl

---

[2] The full names of Vince and C4 are not indicated in the record.

Streeter, shouted from the gallery "I told you don't f*** with me." The trial court paused the video and, after the jury left the courtroom, found Earl Streeter in direct contempt and had him taken into custody. The jury then returned to the courtroom, and the trial court asked the jury whether there was "anything that would interfere with you judging this trial fairly." No jurors indicated that the outburst affected their impartiality.

¶ 24    The parties then stipulated that, if called to testify, Dr. Hillary McElligott (Dr. McElligott), an assistant medical examiner employed by the Cook County Medical Examiner's Office, would testify as an expert in the field of forensic pathology. Dr. McElligott performed an autopsy on the body of Brown. She would opine with a reasonable degree of medical and forensic certainty that the cause of death was a gunshot wound and the manner of death was homicide. The State rested.

¶ 25    The parties then stipulated that, if called to testify, Chicago police lieutenant McFarlane (Lieutenant McFarlane) would testify that on the day of the shooting, a witness had informed him that an unknown offender in a white four-door vehicle that was traveling southbound on State Street "shot" into a crowd of people on the basketball court in Metcalfe Park.[3] The defense rested.

¶ 26    Following closing arguments, the jury found defendant guilty of first-degree murder of Brown under an accountability theory. The jury, however, found defendant not guilty of attempted first-degree murder of Barron and did not find that defendant had personally discharged a firearm.

¶ 27                    C. Vito Richmond's Conviction and Sentence

¶ 28    In a separate trial, a jury convicted Richmond of first-degree murder and attempted first-

_____

[3] The record on appeal does not disclose Lieutenant McFarlane's full name.

degree murder. *People v. Richmond*, 2018 IL App (1st) 142194-U, ¶ 20. Richmond was

sentenced to 22 years for first-degree murder plus a 20-year mandatory firearm enhancement and

6 years for attempted murder plus a 20-year firearm enhancement for a total of 68 years'

imprisonment. *Id.* ¶ 23. In 2018, this court found that Richmond was a juvenile at the time he

committed his offenses and was given a *de facto* life sentence, and we vacated Richmond's

sentence and remanded the matter for resentencing. *Id.* ¶¶ 61, 72. In 2020, Richmond was

resentenced to 24 years for first-degree murder and 6 years for attempted murder.

### D. Posttrial Proceedings

¶ 29    Defendant filed a motion for a new trial, which the trial court denied. The matter

proceeded to sentencing. Defendant's presentence investigation report (PSI) reflected that

defendant had been found guilty of aggravated battery causing great bodily harm as a juvenile

and had been placed on five years' probation. In the instant case, the trial court sentenced

defendant to 50 years' imprisonment. Defendant then filed an amended motion to reconsider

sentence, and subsequently, the trial court resentenced defendant to 40 years' imprisonment.

¶ 30                                          E. Appeal

¶ 31    Defendant appealed, arguing that (1) the trial court erred in denying his motion to

suppress, (2) the State failed to prove him guilty of first degree murder beyond a reasonable

doubt, (3) his trial counsel was ineffective at the suppression hearing and at trial, and (4) the trial

court denied him a fair trial when it improperly defined reasonable doubt to the jury. We

affirmed defendant's conviction and sentence. See *People v. Streeter*, 2017 IL App (1st) 140990-

U, ¶ 82.

¶ 32                                  F. Postconviction Petition

¶ 33    In March 2019, defendant filed a *pro se* postconviction petition in which he alleged that

his trial counsel was ineffective for failing to call Jordan at the suppression hearing. In addition, defendant alleged that his appellate counsel was ineffective for failing to argue on direct appeal that defendant's trial counsel was ineffective for failing to move for a mistrial after either the jurors expressed concerns about their safety or Earl Streeter's outburst. Finally, defendant alleged that his sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution and that his 40-year sentence for first-degree murder was disproportionate to his co-defendant Richmond's 22-year sentence for first-degree murder. Attached to defendant's petition was an affidavit from Jordan, who asserted that she never spoke to Detective Stanek over the phone or in person. Jordan further asserted that she never spoke to any detective while defendant was in custody.

¶ 34    In June 2019, the trial court summarily dismissed the petition at the first stage, finding that the petition was frivolous and patently without merit. The trial court found without merit defendant's claims that his trial and appellate counsels were ineffective, that his sentence violated the eighth amendment of the United States Constitution, and that his sentence was disproportionate to Richmond's sentence. As to defendant's claim that his sentence was disproportionate, the trial court noted that Richmond's sentence had been vacated and that he had not been resentenced yet. Thus, the trial court concluded that defendant's assertion that Richmond received a 22-year sentence was false.

¶ 35    This appeal follows.

¶ 36                                ANALYSIS

¶ 37    On appeal, defendant argues that the trial court erred in dismissing his postconviction petition, which he asserts sufficiently set forth claims that (1) defendant received ineffective assistance of trial counsel, (2) defendant received ineffective assistance of appellate counsel, (3)

defendant's sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution, and (4) defendant's sentence was disproportionate to Richmond's sentence. For the following reasons, we affirm.

¶ 38                                    The Act

¶ 39    The Act "provides a method by which defendants may assert that, in the proceedings which resulted in their convictions, there was a substantial denial of their federal and/or state constitutional rights." *People v. Wrice,* 2012 IL 111860, ¶ 47. A proceeding under the Act is a collateral proceeding and not an appeal from the defendant's conviction and sentence. *People v. Beaman,* 229 Ill. 2d 56, 71 (2008). The defendant must show he suffered a substantial deprivation of his federal or state constitutional rights. *People v. Caballero,* 228 Ill. 2d 79, 83 (2008).

¶ 40    The Act (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2018). Claims are limited to those that were not and could not have been litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the trial court determines whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2018). At the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2018). Only if the petition and accompanying documentation make a substantial showing of a constitutional violation will the defendant proceed to the third stage, an evidentiary hearing on the merits. *People v. Silagy*, 116 Ill. 2d 357, 365 (1987); 725

ILCS 5/122-6 (West 2018).

¶ 41     Defendant's petition was dismissed at the first stage. Our supreme court has made clear

that, to survive first-stage scrutiny, a petition must state the "gist" of a constitutional claim.

*People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Formal legal argument and citation of authority are not

required (*id.*), and all well-pleaded facts that are not positively rebutted by the record are taken as

true (*People v. Romero*, 2015 IL App (1st) 140205, ¶ 26). A petition may be summarily

dismissed as "frivolous or patently without merit" when it has "no arguable basis either in law or

in fact," or in other words, when the petitioner's claim relies "on an indisputably meritless legal

theory or a fanciful factual allegation." (Internal quotation marks omitted.) *People v. Boykins*,

2017 IL 121365, ¶ 9. We review the summary dismissal of a postconviction petition *de novo*.

*People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 42                              Ineffective Assistance of Trial Counsel

¶ 43     Defendant first asserts that the trial court erred in summarily dismissing his

postconviction petition, which set forth an arguable claim of ineffective assistance of trial

counsel. In his petition, defendant alleged that had his trial counsel called Jordan as a witness at

the suppression hearing, she would have rebutted Detective Stanek's testimony at the

suppression hearing that he informed Jordan that defendant was in custody. Defendant asserts

that, had counsel called Jordan as a witness, the trial court arguably would have found that the

police violated defendant's statutory right to communicate with his family under section 103-3 of

the Code (725 ILCS 5/103-3 (West 2010)) and granted defendant's motion to suppress.

¶ 44     At the first stage of postconviction proceedings under the Act, a petition alleging

ineffective assistance may not be summarily dismissed if (1) it is arguable that counsel's

performance fell below an objective standard of reasonableness and (2) it is arguable that the

defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17. Further, "[w]here it is possible to resolve an ineffective-assistance claim on the basis that the defendant suffered no prejudice as a result of counsel's allegedly defective performance, the claim may be decided against the defendant without consideration of whether counsel's performance was actually deficient." *People v. Coleman*, 168 Ill. 2d 509, 528 (1995). Since we conclude that defendant was not arguably prejudiced by counsel's failure to call Jordan as a witness, we need not consider whether counsel's performance was arguably unreasonable. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528.

¶ 45 We find that defendant was not arguably prejudiced by his trial counsel's failure to call Jordan as a witness. When defendant was arrested and detained, section 103-3 of the Code provided that "[p]ersons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner." 725 ILCS 5/103-3 (West 2010). Our supreme court has asserted that the purpose of section 103-3 is to allow a detainee "to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody." *People v. Prim*, 53 Ill. 2d 62, 69-70 (1975); see also *People v. Green*, 2014 IL App (3d) 120522, ¶ 55 (citing *id.* at 69) ("The intention of this section of the Code is to 'permit a person held in custody to notify his family of his whereabouts' to enlist their help for procedural safeguards such as hiring an attorney.").

¶ 46 On direct appeal, this court rejected defendant's contention that the police denied his rights under section 103-3 of the Code. *People v. Streeter*, 2017 IL App (1st) 140900-U, ¶ 49. We reasoned in part that "the record does not demonstrate that defendant's requests to call

Jordan were made for legal advice." *Id.* We further reasoned that "defendant admitted he never asked to speak to an attorney" and that "defendant was advised of his right to counsel and waived such right." *Id.*

¶ 47 Even if defendant's trial counsel had called Jordan as a witness to rebut Detective Stanek's testimony that he had spoken to Jordan, the record still would have demonstrated that defendant never explained that he sought to call Jordan for the purpose of obtaining counsel, that he never asked to speak to an attorney, and that he validly waived his right to counsel. See *id.* Therefore, regardless of whether defendant's trial counsel had called Jordan as a witness, the record still would have demonstrated that defendant's rights under section 103-3 of the Code were not violated. See *id.*; see also *People v. Williams*, 2017 IL App (1st) 142733, ¶ 35 (finding no violation of section 103-3 since the defendant failed to "state the phone call was to request an attorney or inform his family of his location so they could provide an attorney"); *People v. Green*, 2014 IL App (3d) 120522, ¶¶ 55-58 (finding no violation of section 103-3 since "the record does not show that [the defendant's] requests for his family were made for legal advice" and since defendant validly waived his right to counsel).

¶ 48 Thus, we find that the failure of defendant's trial counsel to call Jordan as a witness did not arguably prejudice defendant. See *Hodges*, 234 Ill. 2d at 17.

¶ 49                    Ineffective Assistance of Appellate Counsel

¶ 50 Defendant next asserts that the trial court erred in summarily dismissing his postconviction petition, which alleged that defendant's appellate counsel was ineffective. Specifically, defendant asserts that appellate counsel failed to argue that the trial court erred in failing to declare a mistrial when Earl Streeter shouted "I told you don't f*** with me" or when the jurors voiced concerns about their safety.

¶ 51                                    *Forfeiture*

¶ 52     The State notes that defendant's postconviction petition did not allege that appellate counsel was ineffective by failing to argue that the trial court erred in failing to *sua sponte* declare a mistrial. Rather, the petition alleged that appellate counsel was ineffective by failing to argue that trial counsel was ineffective in failing to seek a mistrial. Thus, the State argues that defendant has forfeited his argument that appellate counsel was ineffective. We agree.

¶ 53     When a defendant fails to raise a claim in a postconviction petition, he or she forfeits that claim. 725 ILCS 5/122-3 (West 2018). In the case at bar, since defendant never alleged in his postconviction petition that appellate counsel was ineffective for failing to argue that the trial court erred, we find that defendant has forfeited his contention that appellate counsel was ineffective. See *id.*

¶ 54     In reaching this determination, we have considered *People v. Thomas*, 2014 IL App (2d) 121001, upon which defendant relies to support his contention that he did not forfeit his argument that appellate counsel was ineffective. In *Thomas*, prior to the defendant's trial for first-degree murder, the defendant moved to admit the statement of N.H., who, during an interview with police detectives, stated "I did it." *Id.* ¶ 21. The trial court denied the motion, finding that N.H.'s statement was not corroborated by other evidence. *Id.* ¶ 39. In addition, the defendant filed a motion *in limine* to compel the testimony of a chaplain, who spoke to N.H. in jail. *Id.* ¶ 24. During a hearing on the motion, the chaplain testified that N.H. confessed to committing the murder for which the defendant was accused. *Id.* ¶¶ 27-30. The trial court denied the motion, barring any evidence of N.H.'s confession to the chaplain. *Id.* ¶ 33.

¶ 55     Following trial, the defendant was convicted of first-degree murder, and on direct appeal, the appellate court affirmed the trial court's finding that N.H.'s confession to the police was not

corroborated. *Id.* ¶¶ 35, 39. The defendant did not raise on direct appeal the trial court's exclusion of the chaplain's testimony. *Id.* ¶ 39.

¶ 56   The defendant filed a postconviction petition. *Id.* ¶ 41. In his petition, the defendant asserted a claim alleging that his appellate counsel was ineffective by failing to argue on direct appeal that his trial counsel was ineffective for failing to investigate and present evidence that N.H. had confessed to the murder for which the defendant was convicted. *Id.* ¶ 53. In support, the defendant alleged that the trial court suppressed N.H.'s confession to the police as well as his confession to the chaplain. *Id.* The defendant further alleged that his trial counsel was ineffective for failing to corroborate N.H.'s statement to the police detectives and that, had N.H.'s statement been corroborated, there was a reasonable probability that the outcome of the defendant's trial would have been different. *Id.* The trial court summarily dismissed the petition. *Id.* ¶ 41.

¶ 57   The defendant appealed the summary dismissal, contending that his petition stated the gist of a constitutional claim that his appellate counsel was ineffective by failing to argue that the trial court erred when it barred N.H.'s confession to the chaplain. *Id.* ¶ 56. In response, the State argued that the defendant forfeited this contention since the defendant's petition never alleged that his appellate counsel was ineffective by failing to argue that the trial court erred. *Id.* ¶ 58. The State noted that, instead, the defendant's petition alleged that his appellate counsel was ineffective by failing to argue ineffective assistance of trial counsel. *Id.* The *Thomas* court rejected the State's forfeiture argument, finding in part that the petition alleged that the trial court erred by excluding N.H.'s confession to the chaplain. *Id.* ¶ 61. In addition, after liberally construing the defendant's petition and the record, the *Thomas* court found that "the logical conclusion to be drawn" from the petition's allegations is that the chaplain's testimony was the "other evidence" that the trial court should have admitted to corroborate N.H.'s statement to the

police detectives. *Id.* ¶ 62.

¶ 58    We find *Thomas* distinguishable from the case at bar. In *Thomas*, the court found that the postconviction petition alleged that the trial court erred by excluding N.H.'s confession to the chaplain. *Id.* ¶ 61. Further, the *Thomas* court liberally construed the petition and record to find that the petition alleged that the trial court should have admitted the chaplain's testimony to corroborate N.H.'s confession to police detectives. *Id.* ¶ 62. Here, in contrast, defendant's petition explicitly and repeatedly faulted his trial counsel for failing to seek a mistrial, and it alleged that his appellate counsel was ineffective for failing to raise this argument on direct appeal. Defendant's petition never alleged that the trial court erred in failing to *sua sponte* declare a mistrial or that his appellate counsel should have raised this argument on direct appeal. See *id.* ¶¶ 61-62. A liberal construction of the petition and record cannot overcome this deficiency. See *id.* ¶ 62.

¶ 59    Thus, we find that defendant has forfeited his argument that his appellate counsel provided ineffective assistance. See *id.* ¶ 86 ("[W]hen a *pro se* petition is summarily dismissed, postconviction appellate counsel may not present novel arguments that bear no relationship to the petition."). Nevertheless, since forfeiture is a limitation on the parties and not the court, we overlook defendant's forfeiture and consider his contention on the merits. See *People v. Sophanavong*, 2020 IL 124337, ¶ 21.

¶ 60                                              *Ineffective Assistance*

¶ 61    We now turn to defendant's contention on the merits. At issue here is whether defendant set forth the gist of a constitutional claim that appellate counsel was ineffective for failing to argue that the trial court should have declared a mistrial when Earl Streeter shouted "I told you don't f*** with me" or when the jurors voiced concerns about their safety.

¶ 62    A criminal defendant has a constitutional right to the effective assistance of counsel in an appeal. *Evitts v. Lucey*, 469 U.S. 387, 393-97 (1985); *People v. Robinson*, 217 Ill. 2d 43, 61 (2005). "[A] claim of ineffective assistance of counsel on appeal is cognizable under the [Act] [citation]." *People v. Mack*, 167 Ill. 2d 525, 531 (1995). Further, "[c]laims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 66. Thus, a defendant must show that (1) the failure to raise an issue on appeal was objectively unreasonable and (2) that decision prejudiced the defendant. *Id.* Unless the underlying claims are meritorious, appellate counsel's failure to raise those claims on appeal cannot prejudice defendant. *Id.*

¶ 63    Since defendant failed to raise these issues at trial by contemporaneous objection or in a posttrial motion, defendant's appellate counsel could have only requested that this court review these issues under the plain-error doctrine. *People v. Redmond*, 2018 IL App (1st) 151188, ¶ 13. The plain-error doctrine, however, is a narrow and limited exception. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred. *People v. Piatkowski,* 225 Ill.2d 551, 565 (2007). Thus, to determine whether there was plain error, we must first determine whether an error occurred. *People v. Pike*, 2016 IL App (1st) 122626, ¶ 109.

¶ 64    A trial court must declare a mistrial when it appears that the jurors were so influenced that they could not have been fair and impartial. *People v. Holliday*, 2020 IL App (5th) 160547, ¶ 37. When a defendant alleges that intimidation influenced the jurors, the defendant must show that they had a disqualifying state of mind; the defendant's mere suspicion of impartiality is not enough. *People v. Williams*, 344 Ill. App. 3d 334, 336 (2003). When deciding whether the jurors

were so influenced that they could not be fair and impartial, a reviewing court should consider all of the circumstances surrounding the alleged prejudicial events. *People v. Walker*, 386 Ill. App. 3d 1025, 1029 (2008). Further, we must give important consideration to the jurors' assurances that they can disregard alleged prejudicial events and remain fair. *Id.*

¶ 65 We first address defendant's claim that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred. During trial, a sheriff informed the trial court that several jurors expressed concerns that when they arrived and departed from the courthouse, people were pointing at them, staring at them, and "watching other jurors come in." The trial court first brought into chambers all the jurors who expressed concerns. M.L. informed the trial court that "I feel like I'm going to cry right now" and that "[i]t makes me very nervous that whatever we decide, one side obviously is going to be really unhappy ***." In addition, J.B. informed the trial court that people were waiting for the jurors to walk by when they left the courtroom, a young lady made a face at the jurors, and another person said "I think that's one [of] them right there." J.B. asserted that these people were from Brown's family. The trial court said that nothing would happen to the jurors and excused them.

¶ 66 The trial court then brought into chambers each juror who expressed concerns. Each juror indicated that they could be fair. Specifically, M.L. informed the trial court that she was scared but was not biased toward either side. In addition, when asked whether J.B. could remain fair, J.B. stated, "Yes, I am fine." The trial court also addressed all the jurors in open court, assuring them they were safe and asking them whether they could remain fair. All the jurors indicated that they could be fair.

¶ 67 We find that defendant has not shown that a clear or obvious error occurred. The trial court, on several occasions, assured the jurors that they were safe. Importantly, all the jurors

indicated that they could remain fair, and the jurors who expressed concerns twice indicated that they could remain fair. See *Walker*, 386 Ill. App. 3d at 1029. Further, even though M.L. stated that "I'm going to cry right now," she later informed the trial court that she was scared but not biased toward either side. Similarly, J.B. stated "I am fine." See *id.* Thus, given the jurors' repeated assurances that they could remain fair, along with the surrounding circumstances of the case, we find that the record fails to demonstrate that alleged intimidation so influenced the jurors that they could not remain fair and impartial. See *id.*; *Williams*, 344 Ill. App. 3d at 336.

¶ 68    Defendant asserts that the jurors who did express concerns affected the jurors who did not express concerns. Defendant, however, fails to point to any evidence in the record that the jurors who did not express concerns were biased, and this assertion is mere speculation. See *People v. Smith*, 341 Ill. App. 3d 729, 741 (2003); *People v. Bolla*, 114 Ill. App. 3d 442, 450 (1983).

¶ 69    Defendant further argues that the trial court should have declared a mistrial after Earl Streeter shouted from the gallery "I told you don't f*** with me." Defendant asserts that after the jurors were allegedly intimidated, the jurors "were also likely further alarmed" after Earl Streeter's outburst and that it "strengthened the jurors' perception that there were members of the audience that were potentially dangerous." Again, defendant has merely asserted a suspicion of impartiality, and he fails to point to any evidence in the record demonstrating that Earl Streeter's outburst caused the jurors to have a disqualifying state of mind. See *Williams*, 344 Ill. App. 3d at 336. Moreover, after the trial court found Earl Streeter in direct contempt and had him taken into custody, the trial court asked the jury whether there was "anything that would interfere with you judging this trial fairly," and no jurors indicated that the outburst affected their impartiality. See *Walker*, 386 Ill. App. 3d at 1029.

¶ 70    We find that defendant's underlying claims are not meritorious, and his appellate

counsel's failure to raise those claims on direct appeal did not prejudice defendant. See *Phillips*, 2017 IL App (4th) 160557, ¶ 66. Since defendant was not prejudiced, we need not address whether appellate counsel's performance was defective. See *Coleman*, 168 Ill. 2d at 528; *Phillips*, 2017 IL App (4th) 160557, ¶ 66. Therefore, we find that defendant failed to set forth the gist of an ineffective assistance of appellate counsel claim. See *Hodges*, 234 Ill. 2d at 9.

Eighth Amendment and Proportionate Penalties Clause

¶ 71 Defendant argues that he has stated the gist of a claim that his 40-year sentence, as applied to his specific circumstances, violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Defendant, who was 18 years old at the time of the offense, argues that the evolving science on juvenile maturity and brain development highlighted in *Miller v. Alabama*, 567 U.S. 460, 489 (2012), applies to both juveniles and young adults. He further asserts that the trial court failed to consider his youth and its attendant characteristics when sentencing him. We first turn to examine his claim under the eighth amendment.

¶ 72                                    *Eighth Amendment Claim*

¶ 73 Defendant's as-applied constitutional challenge stems from a line of cases from the United States Supreme Court providing heightened protections for juvenile defendants in sentencing under the eighth amendment of the United States Constitution, which prohibits cruel and unusual punishment. U.S. Const., amend. VIII. The Supreme Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper v. Simmons*, 543 U.S. 551, 578-79 (2005)), mandatory life sentences without the possibility of parole for juveniles who commit nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences without the possibility of parole for juveniles who commit murder (*Miller v.*

*Alabama*, 567 U.S. 460, 489 (2012)). These cases reflect society's evolving recognition that "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. First, juveniles generally "lack *** maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking." (Internal quotation marks omitted.) *Id.* Second, because of their "limited contro[l] over their own environment" and their general inability to remove themselves from crime-producing settings, juveniles "are more vulnerable *** to negative influences and outside pressures." (Internal quotation marks omitted.) *Id.* Third, juveniles have characteristics that are not as "well-formed" as those of adults; juveniles' traits are "less fixed" and their actions are "less likely to be evidence of irretrievabl[e] depravit[y]." (Internal quotation marks omitted.) *Id.*

¶ 74        Following *Miller*, courts must consider juveniles' youth and attendant characteristics before sentencing them to life without parole. *Id.* at 483. In *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), the Court held that this new substantive rule of constitutional law applies retroactively. Our own supreme court has gone further, finding that *Miller* applies regardless of whether the life sentence imposed is mandatory or discretionary, natural or *de facto*. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10; *People v. Holman*, 2017 IL 120655, ¶ 40.

¶ 75        These protections afforded by the eighth amendment, however, apply only to juveniles. As our supreme court has noted, the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 58. This cutoff was established "not based primarily on scientific research" (*id.* ¶ 60) but because the United States Supreme Court felt that "a line must be drawn" and because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood" (*Roper*, 543 U.S. at 574). Since defendant was 18

years old at the time of his offense, he failed to state the gist of a constitutional claim that his sentence violated the eighth amendment.

¶ 76    We further observe that defendant was sentenced to 40 years' imprisonment. In *People v. Buffer*, 2019 IL 122327, ¶ 41, our supreme court concluded that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." Therefore, because defendant's sentence was not a *de facto* life sentence, it does not violate the eighth amendment. See *id.*

¶ 77                              *Proportionate Penalties Clause Claim*

¶ 78    We next turn to consider defendant's argument that he set forth the gist of a claim that his sentence violated the proportionate penalties clause. As noted, the supreme court's supervisory order directed us to "consider the effect of [the supreme court's] opinion in *People v. Hilliard*, 2023 IL 128186, ¶ 29 on the issue of whether defendant may challenge his sentence under the proportionate penalties clause where the sentence is not a *de facto* life sentence and determine if a different result is warranted." *Streeter*, No. 128792 (Ill. Jan. 24, 2024) (supervisory order). We accordingly modify our prior analysis in light of the supreme court's directive. We note, however, that where the supreme court remands a case, pursuant to a supervisory order, for reconsideration in light of a recent decision, it does not necessarily suggest that a different result is warranted. *People v. Phillips*, 217 Ill. 2d 270, 280 (2005). Instead, the supreme court has made it clear that it "expect[s] the appellate court to exercise its independent judgment in such matters." *Id.*

¶ 79    In its original brief on appeal, the State maintained that defendant forfeited this argument since he failed to raise it on direct appeal. For the reasons that follow, based on our supreme court's recent decisions, we disagree with the State and find that this claim has not been

forfeited.

¶ 80    The proportionate penalties clause of the Illinois Constitution specifically provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has explained that this emphasis on rehabilitative potential provides "a limitation on penalties beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. Our supreme court, three times, has acknowledged that young adult offenders are not foreclosed from raising under the proportionate penalties clause as-applied challenges to their life sentences based on the evolving science of juvenile maturity and brain development. See *People v. House*, 2021 IL 125124, ¶¶ 31-32; *Harris*, 2018 IL 121932, ¶¶ 46, 48; *People v. Thompson*, 2015 IL 118151, ¶ 44.

¶ 81    In *Thompson*, the court concluded that an as-applied, youth-based sentencing claim of an 18-year-old offender would be more appropriately raised in postconviction proceedings rather than on direct appeal due to the lack of a developed record. *Thompson*, 2015 IL 118151, ¶¶ 43-44. In *Harris*, the court reached the same conclusion when it considered an as-applied, youth-based sentencing claim of a 19-year-old offender. *Harris*, 2018 IL 121932, ¶ 48. Finally, in *House*, the court reviewed the second-stage dismissal of the defendant's postconviction petition and, finding that the defendant's proportionate penalties claim merited the trial court's consideration, reversed the dismissal and remanded the matter for further second-stage proceedings to develop the record. *House*, 2021 IL 125124, ¶ 32. Thus, our supreme court has left open the possibility that young adult offenders may demonstrate in postconviction proceedings that their characteristics are so similar to a juvenile's that imposing on them a life sentence, absent *Miller*'s safeguards, is "cruel, degrading, or so wholly disproportionate to the

offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009).

¶ 82     In the case at bar, however, the trial court did not impose a life sentence on defendant. The trial court sentenced defendant to 50 years' imprisonment, but upon defendant's amended motion to reconsider, the trial court resentenced defendant to 40 years' imprisonment. As stated above, a term of 40 years' imprisonment is not a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 41. Thus, *Miller*'s safeguards are inapplicable to defendant, meaning that he failed to allege the gist of a constitutional claim under the proportionate penalties clause on this basis. See *Miller*, 567 U.S. at 489; *House*, 2021 IL 125124, ¶ 32; *Harris*, 2018 IL 121932, ¶ 48; *Thompson*, 2015 IL 118151, ¶¶ 43-44. Our supreme court reaffirmed this reasoning in *Hilliard*, expressly noting that reliance on *Thompson*, *Harris*, and *House* is inappropriate unless the issue involves a proportionate-penalties clause challenge by a young adult who received a mandatory life sentence. See *Hilliard*, 2023 IL 128186, ¶ 28 (criticizing appellate court cases relying on those cases, where they "fail to recognize that our cases were directing the possibility of as-applied proportionate penalties clause postconviction challenges to young adults who received mandatory life sentences").

¶ 83     *Hilliard* also makes clear, however, that a proportionate penalties clause challenge is not limited to juveniles or challenges to life sentences. *Id.* ¶ 29. Instead, "a defendant may challenge a sentence of any length." *Id.* In his supplemental briefs on appeal, therefore, defendant now argues that his sentence violated the proportionate penalties clause even without a *Miller*-type analysis.[4]

---

[4] We note that, in his initial briefing on appeal, defendant focused solely on the applicability of a *Miller*-type analysis. The arguments he raises in his supplemental briefs, therefore, are arguably forfeited. Nevertheless, defendant did include facts applicable to a more general proportionate penalties clause analysis in his *pro se* postconviction petition, so we choose to consider his argument. We do not,

¶ 84     As applicable to the case at bar, a statute violates the proportionate penalties clause where " 'the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Id.* ¶ 20 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*)). Our supreme court has not defined the meaning of such a standard, since "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Leon Miller*, 202 Ill. 2d at 339. Instead, in conducting a proportionate penalties clause analysis under this standard, a court reviews "the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 85     In this case, defendant was convicted of first-degree murder and received a discretionary sentence of 40 years' imprisonment. The sentencing range for first-degree murder is 20 to 60 years, so defendant's sentence falls squarely in the center of the sentencing range. See 730 ILCS 5/5-4.2-20(a) (West 2010). Moreover, although defendant attempts to minimize his culpability by noting that he was found guilty on an accountability theory, defendant was nonetheless convicted of first-degree murder, an extremely serious offense. We also note that defendant raised the same arguments he raises here—including that his original sentence failed to give adequate weight to his youth and his rehabilitative potential in violation of the proportionate penalties clause, and that his conviction was based on accountability and did not include a finding that he was armed with a firearm—in his motion to reconsider sentence. As a result, defendant did, in fact, succeed in obtaining a sentence which was 10 years less than his original sentence of 50 years. We therefore cannot find that defendant's sentence even arguably "shock[s]

---

however, consider defendant's arguments based on the subsequent resentencing of codefendant Beachem, as that information was not available to the trial court at the time of its dismissal of defendant's postconviction petition.

the moral sense of the community" (*Leon Miller*, 202 Ill. 2d at 338) so as to violate the proportionate penalties clause, where he was convicted of an extremely serious offense, received a sentence within the statutory sentencing range, and the record demonstrates that the trial court considered defendant's youth and rehabilitative potential in fashioning its sentence.

¶ 86                                 Disproportionate Sentence

¶ 87    Finally, defendant contends that he sufficiently set forth a claim that his 40-year sentence for first-degree murder is grossly disproportionate to Richmond's 24-year resentence for first-degree murder.

¶ 88    The State notes that when defendant filed his post-conviction petition, Richmond's original sentence had been vacated, and Richmond had not yet been resentenced. Further, the State asserts that since Richmond did not yet have a sentence, defendant could not have claimed that his sentence was disproportionate. Thus, the State contends that our vacatur of Richmond's original sentence rendered defendant's disproportionate-sentence claim moot.

¶ 89    Sentencing claims are only rendered moot when the "circumstances have changed during the pendency of the appeal that prevent this court from rendering effectual relief." *People v. Williams*, 209 Ill. 2d 227, 232 (2004). On the other hand, "an appeal remains viable where a decision could have a direct impact on the rights and duties of the parties." (Internal quotation marks omitted.) *People v. Jackson*, 199 Ill. 2d 286, 294 (2002).

¶ 90    Since, at the time of this appeal, Richmond has a new sentence, we find that we are not prevented from rendering effectual relief or issuing a decision that can impact the parties' rights and duties. See *Williams*, 209 Ill. 2d at 232; *Jackson*, 199 Ill. 2d at 294. We thus decline to find defendant's claim moot.

¶ 91    Turning to the merits, defendant asserts that his 40-year sentence for first-degree murder

was disproportionate to his co-defendant Richmond's 24-year sentence for first-degree murder. Defendant contends that these sentences are grossly disproportionate since defendant was convicted under a theory of accountability while Richmond was found to have discharged the firearm.

¶ 92      Disproportionate-sentence claims are cognizable under the Act. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). "Arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible." *Id.* A mere disparity in sentences, however, does not by itself establish that a defendant's sentence is fundamentally unfair. *People v. Kline*, 92 Ill. 2d 490, 508 (1982). It is not the disparity that counts, but the reason for the disparity. *People v. Martinez*, 372 Ill. App. 3d at 750, 760 (2007). A difference in sentences may be justified by factors including the defendant and codefendants' relevant character and history, degree of culpability, criminal records, or rehabilitative potential. *People v. Rodriguez*, 402 Ill. App. 3d 932, 940 (2010).

¶ 93      In the case at bar, we first observe that when defendant committed the offense, he was an adult and was previously found guilty of aggravated battery. Richmond, on the other hand, was a juvenile when he committed his offense. Moreover, defendant fails to point to any criminal record from Richmond, conceding that "it is unclear whether Richmond had any prior convictions." Thus, although defendant was convicted under a theory of accountability while Richmond was found to have discharged the firearm, given defendant and Richmond's character and history as well as defendant's criminal record, we find that defendant's postconviction petition failed to sufficiently allege that he and Richmond were similarly situated or that the disparity between their sentences was "arbitrary or unreasonable." *Caballero*, 179 Ill. 2d at 216; *Rodriguez*, 402 Ill. App. 3d at 940.

¶ 94                                  CONCLUSION

¶ 95    For the reasons set forth above, we affirm the trial court's summary dismissal of

defendant's *pro se* postconviction petition.

¶ 96    Affirmed.